RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

RENE A. BOUCHER,

*Defendant-Appellee*.

No. 18-5683

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:18-cr-00004-1—Marianne O. Battani, District Judge.[*]

Argued: July 31, 2019

Decided and Filed: September 9, 2019

Before: SILER, STRANCH, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Bob Wood, UNITED STATES ATTORNEY'S OFFICE, Indianapolis, Indiana, for Appellant. Matthew J. Baker, Bowling Green, Kentucky, for Appellee. **ON BRIEF:** Bob Wood, UNITED STATES ATTORNEY'S OFFICE, Indianapolis, Indiana, for Appellant. Matthew J. Baker, Bowling Green, Kentucky, for Appellee.

---

[*]The Honorable Marianne O. Battani, United States District Judge for the Eastern District of Michigan, sitting by designation pursuant to 28 U.S.C. § 292(b).

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.  Senator Rand Paul was mowing his lawn when he stopped to gather a few limbs in his path.  Without warning, Rene Boucher—Paul's next-door neighbor, whom he had not spoken with in years—raced toward Paul and attacked him from behind.  The impact broke six of Paul's ribs, caused long-lasting damage to his lung, and led to several bouts of pneumonia.  Boucher later pleaded guilty to assaulting a member of Congress in violation of 18 U.S.C. § 351(e).  Although his Guidelines sentencing range was 21 to 27 months in prison, the district court sentenced him to 30 days' imprisonment.  On appeal, the Government argues that Boucher's sentence was substantively unreasonable.  We agree and therefore **VACATE** his sentence and **REMAND** for resentencing.

## I.  BACKGROUND

### A.  Factual Background

Paul and Boucher were neighbors.  According to Paul, their relationship was unremarkable—they had not directly spoken in years, though they might wave to one another if they crossed paths on the street.  From Boucher's perspective, however, problems between them began in the summer of 2017, when he decided to trim the branches of five maple trees in Paul's backyard that had grown over the Boucher/Paul property line.  Sometime shortly thereafter, Paul dropped a bundle of limbs and brush at the edge of his property, apparently in the sightline of Boucher's home.  A few weeks passed and the bundle remained.  Frustrated by the sight of yard debris, Boucher crossed onto Paul's property, removed the limbs and brush, and hauled them off in dumpsters.

The following month, Boucher noticed another bundle of limbs and brush in roughly the same location.  He hauled it off again.  A few days later, a bundle reappeared.  This time Boucher did not haul it away; he poured gasoline over the debris and lit a match.  The ensuing fireball caught him by surprise.  The debris was burned, but so was Boucher—he suffered second-degree burns on his arms, neck, and face.

When Paul got on his lawnmower the next day, Boucher was watching him from the top of a hill overlooking Paul's property.  According to Boucher, he saw Paul "blow all of the leaves from his property onto Boucher's yard."  Paul then got off his lawnmower, picked up a few more limbs, and turned toward the site of the burned debris pile.  While Paul had his back to the hill, Boucher ran 60 yards downhill and hurled himself headfirst into Paul's lower back.  The impact broke six of Paul's ribs, including three that split completely in half.  After a brief fracas, Paul left the scene and called the police.

The Kentucky State Police were the first to respond.  In an interview with officers, Boucher admitted to tackling Paul but denied doing so because of Paul's politics.  Instead, he described the assault as the culmination of "a property dispute that finally boiled over."

## B.  Procedural History

The Warren County Attorney initially charged Boucher with Fourth Degree Misdemeanor Assault under Kentucky law.  He was taken into custody for a few days, after which the FBI intervened and the state charges were dropped.  The Government then indicted Boucher on one count of assaulting a member of Congress in violation of 18 U.S.C. § 351(e).  Boucher pleaded guilty.  His presentence report (PSR) recommended a five-level sentencing enhancement because Paul had suffered "serious bodily injuries."  Boucher did not object.  The five-level increase was partially offset by a three-level reduction for acceptance of responsibility, resulting in a Guidelines sentencing range of 21 to 27 months in prison.

At his sentencing hearing, Boucher called three witnesses.  The first was Amy Milliken, the Warren County Attorney.  Milliken testified that "many times in assault fourth cases, where . . . you're looking at someone older, [] who has ties in the community, [] who has a job, [] who is productive, [and] who has no criminal history, we have somewhat of a standard plea . . . and that would generally be 30 days in the Warren County Regional Jail."  But she also clarified that misdemeanor assault charges were appropriate for only "minor" injuries, and she did not know "the extent of [Paul's] injuries" when she charged Boucher with Fourth Degree Misdemeanor Assault.  Shortly after the attack, she had asked the Commonwealth Attorney (who is responsible for filing felony charges) if he would prefer to charge Boucher with a felony.  He told her that

"until [they] had all the facts, . . . he wanted [her] to go ahead and issue the warrant for assault fourth" so that they could "get the defendant picked up and get the case moving." But before the Commonwealth Attorney could make a determination about felony charges, "federal prosecutors assumed [] jurisdiction" over the case.

Boucher's second witness was Jim Skaggs, one of the developers of the gated community where Boucher and Paul live. Skaggs testified that "we had absolutely no problems" with Boucher, who "always paid his homeowner's dues and kept a neat place." He had "no complaints" about Boucher as a neighbor but conceded that if he "had broken ribs, maybe [he would] feel differently about it." Boucher's final witness was Father John Thomas, the priest at his church. Thomas testified that Boucher was "a friendly, open, kind, faithful person." He recalled that Boucher had visited sick parishioners "a couple of times" and had "helped with preparation for those who [were] interested in learning more about the Catholic faith."

Boucher and his counsel also spoke. Boucher told the court that he was "sincerely sorry" for the assault, apologized to Paul and his family, offered to pay for Paul's medical expenses, and assured the court that he would "never do . . . anything like this again." He added that he would "prefer not to go to jail for this situation" and "plead[ed] for the mercy of the court and forgiveness." Boucher's counsel made a similar plea for leniency. Citing Milliken's testimony, he argued that "if anyone else in Warren County [had gotten] involved in a scuffle over yard trash, . . . we would be in the Warren District Court" and "the resolution would be a 30-day jail sentence . . . ." Counsel also emphasized Boucher's status in the community:

> A felony conviction carries with it, Judge, a very real stigma, and maybe to some people a felony conviction isn't that big of a deal, but for a person who has become board certified in two specialties, who's 60 years old, who is a devout member of his church, who's the father of two wonderful children, and who lives in the nicest neighborhood in Warren County, by my evaluation, a felony conviction is a very real punishment in and of itself.

In lieu of live testimony, the Government responded by introducing two victim impact statements—one from Paul and another from his wife, Kelley. Paul described the extent of his injuries. Because displaced ribs "heal in a crooked fashion," "the free ends of [his] ribs grinded over top of and into each other with any movement," causing him "intense pain." He "had

trouble finishing sentences for lack of air to expel," and "throughout the night [he] would pace [while] suffering from involuntary spasmodic breathing." After an attempted return to work 10 days after the assault, his "fever spiked to 102.6 F, despite being on medication to prevent fevers." He returned to the hospital for testing, and "[a] CAT scan showed pneumonia and fluid around [his] lungs." Antibiotics briefly resolved the illness, but a few weeks later "the fevers and spasmodic breathing returned." Another trip to the hospital revealed that Paul had "recurrent pneumonia." This second bout of pneumonia cleared after another round of antibiotics, but additional scans "still show[ed] an area of damaged lung." Paul wrote that he might "be at risk for future pneumonias" and that he still suffered from "chronic lateral back pain over the ribs."

Kelley likewise testified that Boucher's assault began "a long odyssey of severe pain and limited mobility for" Paul. "A cough or hiccup would literally drive him to his knees, his face in a white grimace," and "[t]he trauma to his body caused him to suffer night sweats accompanied by uncontrollable shivering and shaking." Because Boucher remained the Pauls' next-door neighbor after the attack, Kelley said "the home and backyard [she had] loved for 23 years no longer fe[lt] like my safe sanctuary." Every time she walked in their backyard she "wonder[ed] if he [was] watching out the windows of his house."

In its closing remarks, the Government argued that Boucher's sentence should not be "about who the victim is" but should reflect "what was done to him, the physical harm, the being placed in continued fear to even be in his own backyard, [and] the apprehension of every time he sees Dr. Boucher in the neighborhood [wondering] what is going to happen." The Government also disputed Boucher's claim that he would have served only a 30-day jail sentence if the case had been prosecuted under Kentucky law, maintaining that Boucher's charge "would have been a felony" given the severity of Paul's injuries.

The district court nevertheless sentenced Boucher to 30 days in prison. The court's rationale rested primarily on two observations. First, it found that the confrontation was "strictly [] a dispute between neighbors." Although Paul said he had not spoken with Boucher in years and was aware of no tension between them, the court reasoned that "actions speak louder than words, and . . . one would know by [Boucher's] removal that [he] did not like those—that debris in [his] sightline." The court described the attack as an "isolated," "first-time action," and felt

there was a "spontaneity about when it happened" that suggested Boucher would not "get [himself] involved in anything like this" again.

Second, the court announced that Boucher had an "excellent background." He was "an educated person" who had "gone by 60 years of . . . a good life from the letters that the court ha[d] reviewed" and "from the witnesses who testified," including his pastor and the developer of the gated community. The court also mentioned that Boucher had no criminal history, had served in the military, had "raised two children who [were] doing very well," and had "participated in the community in [his medical] practice and in [his] church."

After weighing these factors, the court decided that a within-Guidelines sentence would not "serve any purpose." It sentenced Boucher to 30 days in prison along with 100 hours of community service, one year of supervised release, and a $10,000 fine. On appeal, the Government argues that this sentence was substantively unreasonable.

## II. ANALYSIS

### A. Substantive Reasonableness

"Substantive reasonableness focuses on whether a 'sentence is too long (if a defendant appeals) or too short (if the government appeals).'" *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019) (quoting *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018)). A substantive reasonableness challenge is not defeated by a showing of procedural reasonableness—for example, by confirming that the district court addressed each relevant factor under 18 U.S.C. § 3553(a), or even that it discussed those factors at length. *See Rayyan*, 885 F.3d at 442 ("The point is not that the district court failed to consider a factor . . . that's the job of procedural unreasonableness."); *see also Gall v. United States*, 552 U.S. 38, 51 (2007) (describing this error as procedural). Rather, in gauging the substantive reasonableness of a sentence, we ask whether the sentencing court gave reasonable *weight* to each relevant factor. If "the court placed too much weight on some of the § 3553(a) factors and too little on others," the sentence is substantively unreasonable regardless of whether the court checked every procedural box before imposing sentence. *Parrish*, 915 F.3d at 1047 (quoting *Rayyan*, 885 F.3d at 442); *see also United States v. Warren*, 771 F. App'x 637, 641–42 (6th Cir. 2019) (reversing upward

variance, even though "the district court engaged in a thorough discussion of several factors set forth in" § 3553(a), because the district court placed too much weight on a single factor).

The district court's decision to assign more or less weight to a given factor is "a matter of reasoned discretion, not math, and our highly deferential review of a district court's sentencing decisions reflects as much." *Rayyan*, 885 F.3d at 442. If a sentence falls within a defendant's Guidelines range, for example, it "is presumed reasonable." *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010). And even if a sentence falls outside that range, it "is not per se or even presumptively unreasonable." *United States v. Borho*, 485 F.3d 904, 912 (6th Cir. 2007). In all cases, this circuit gives sentencing courts broad discretion to fashion individualized, fact-driven sentences without interference from appellate courts.

That discretion is not, however, without limit. When a defendant's sentence falls above or below the Guidelines range, we "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. That is true in part because variances from the Guidelines risk creating unwarranted disparities among similarly situated defendants nationwide. In fact, the Sentencing Reform Act of 1984—which created the Sentencing Commission and the Guidelines it promulgates—was designed to guard against those very disparities. *See Dorsey v. United States*, 567 U.S. 260, 265 (2012). One role of appellate courts is to balance these competing goals—to honor the discretion afforded to sentencing courts on the one hand, and to avoid unjustified disparities on the other.

The Supreme Court has told us how to strike that balance. To avoid sentence disparities, the Guidelines provide a transparent and predictable sentencing range for defendants who fall within the "heartland" of average cases "to which the Commission intends individual Guidelines to apply." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). When a district court varies outside the guideline range, then, we expect the court to explain what distinguishes that defendant's case from a typical one. If the district court reasonably explains why the defendant's unique circumstances fall outside the "heartland" of cases affected by the relevant guideline, then the "court's decision to vary . . . may attract greatest respect." *Id.* But if the district court fails to distinguish the defendant's circumstances from a "mine-run case" under the applicable guideline, then "closer review may

be in order." *Id.* The reason for this "closer review" is simple—the more a sentencing court strays from the Guidelines in a mine-run case, the greater the risk that the defendant's sentence will create unfair disparities.

We have applied this lesson in our own caselaw. In *United States v. Aleo*, for example, we reversed an upward variance because the district court "did not reasonably distinguish [the defendant's case] from other[s]" involving similar crimes. 681 F.3d 290, 302 (6th Cir. 2012). More recently, in *Warren*, we vacated an above-Guidelines sentence where "the only reason the court gave for [the sentence] disparity was [the defendant's] criminal record." 771 F. App'x at 641. Because "his criminal history was already incorporated into the Guidelines-recommended sentence," the variance was "inconsistent with the need to avoid unwarranted sentence disparities." *Id.* at 642 (citation and internal quotation marks omitted).

The Supreme Court's guidance and our own precedents offer two principal takeaways. First, when a district court varies above or below the Guidelines, we "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "The farther the judge's sentence [varies] from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) must be." *Aleo*, 681 F.3d at 302 (citation and internal quotation marks omitted). Second, in looking for that compelling justification, a key question is whether the defendant's case falls within "the 'heartland' to which the Commission intends individual Guidelines to apply." *Kimbrough*, 552 U.S. at 109 (quoting *Rita*, 551 U.S. at 351). If the district court reasonably explains why the defendant's case falls outside the heartland, then the sentence "may attract greatest respect." *Id.* But "a sentence that [varies] from the advisory range in a 'mine-run case' warrants 'closer review.'" *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009) (quoting *Kimbrough*, 552 U.S. at 109).

Here, the district court sentenced Boucher to 30 days' imprisonment, though his Guidelines range was 21 to 27 months. That represented an eight-step decrease in Boucher's

total offense level[1] and a 95% reduction from the lowest end of his recommended sentence. Although we do not reduce substantive reasonableness review to "a rigid mathematical formula," *Gall*, 552 U.S. at 47, the size of the variance remains relevant to our analysis. *See id.* at 50 ("We find it uncontroversial that a major [variance] should be supported by a more significant justification than a minor one."). The question, then, is whether the district court gave a "sufficiently compelling" reason for the dramatic downward variance in this case. *Id.*

**B. The § 3553(a) Factors**

1. The Nature and Circumstances of the Offense

The nature and circumstances of Boucher's crime do not lift this case "outside the 'heartland' to which the Commission intends [the assault guideline] to apply." *Kimbrough*, 552 U.S. at 109 (quoting *Rita*, 551 U.S. at 351). After summarizing the history of this yard-debris controversy, the district court reasoned that the conflict between Paul and Boucher was simply an apolitical "dispute between neighbors." Although a defendant's motive is a relevant—and often important—factor under the Guidelines, Boucher's lack of *political* motivation does not meaningfully distinguish his offense from a mine-run assault case under federal law. The relevant guideline, USSG § 2A2.2, covers a range of assault crimes, not just those involving political figures. This guideline also applies, for example, to certain assaults "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 113, and to "assaulting, resisting, or impeding" federal officers, 18 U.S.C. § 111. Assault cases under either of those statutes will rarely involve a political motive, but they will frequently fall within the heartland of § 2A2.2. Apart from Boucher's apolitical motivation, the district court never differentiated his attack from a garden variety assault case under the Guidelines. *See Herrera-Zuniga*, 571 F.3d at 582.

While the district court focused heavily on the isolated, apolitical nature of the dispute, it gave little weight to "the need for the sentence imposed . . . to reflect the seriousness of [Boucher's] offense." *See* 18 U.S.C. § 3553(a)(2)(A). The court did not address Paul's six

---

[1]Boucher's total offense level was 16. The highest offense level to include a one-month sentence is an offense level of 8, which has a recommended sentencing range of zero to six months' imprisonment. *See* USSG ch. 5, pt. A, Sentencing Table.

broken ribs, his damaged lung, his bouts of pneumonia, or his chronic pain.**2**  And although the court briefly recognized that Boucher's "sentence should not . . . diminish the seriousness of the harm that was caused to the senator," it did not explain why Boucher's 30-day sentence accounted for the severity of Paul's injuries.  Summary reference to "the seriousness of the harm," without tying that harm to the 30-day sentence imposed, was not enough.  *See, e.g.*, *United States v. Peppel*, 707 F.3d 627, 635–36 (6th Cir. 2013) (noting "that a district court must explain how a sentence comports with the level of seriousness of the crime committed," and faulting the court for merely "acknowledg[ing] the seriousness of the offense in broad terms" without "explain[ing] why the [defendant's sentence] was sufficient to reflect the seriousness of [his] crimes").

## 2. Deterrence

Closely related to the seriousness of Boucher's assault is "the need to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  This factor includes two components—specific deterrence and general deterrence.  Specific deterrence looks to dissuade an individual defendant from committing future crimes, while general deterrence aims to have the same effect on "the population at large."  *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010).

The district court fairly weighed the need (or lack thereof) to deter Boucher from committing other crimes.  As explained, the court found that Boucher's attack was an "isolated," "first-time action," and considered it unlikely that he would "get [himself] involved in anything like this" again.  On the other hand, the court gave little weight to the need to promote general deterrence—even though "[c]onsideration of general deterrence is particularly important where the district court varies substantially [downward] from the Guidelines."  *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).  Accepting that Boucher's attack did not appear to be politically motivated, Paul's status as a national political figure is still relevant to the broader "goals of societal deterrence" served by Boucher's sentence.  *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).  Congress saw fit to make § 351(e) a strict liability crime in the interest

---

**2**The court did allude to Paul's "five or six broken ribs" when questioning Milliken earlier in the sentencing hearing.  But it did not discuss Paul's injuries during its application of the § 3553(a) factors.

of protecting our elected representatives from harm. It was the district court's responsibility to explain why those interests did not warrant a within-Guidelines sentence; but it never gave that explanation here. *See Musgrave*, 761 F.3d at 609 ("Where a district court's view of a particular crime's seriousness appears at odds with that of Congress and the Sentencing Commission, we expect that it will explain how its sentence nevertheless affords adequate general deterrence.").

### 3. History and Characteristics

The district court also commended Boucher's "excellent background." It spotlighted his education, medical practice, reputation in the community, involvement in his church, lack of criminal history, military background, and two children who "are doing very well." In its "Statement of Reasons" submitted after sentencing, the court repeated that Boucher was "a 60 year old highly educated medical doctor, Army veteran, father, church member, and good standing community member with no criminal history."

While these factors might distinguish Boucher from a mine-run defendant convicted of assault, they are almost all disfavored as grounds for a below-Guidelines sentence.[3] Congress has instructed the Sentencing Commission to "assure that the guidelines and policy statements, in recommending a term of imprisonment . . . reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 994(e). The Guidelines' policy statements do just that. *See* USSG § 5H1.2 ("Education and vocational skills are not ordinarily relevant [to a defendant's sentence.]"); *id.* § 5H1.5 ("Employment record is not ordinarily relevant."); *id.* § 5H1.6 ("[F]amily ties and responsibilities are not ordinarily relevant."); *id.* § 5H1.11 ("Civic, charitable, or public service . . . and similar good works are not ordinarily relevant."); *id.* § 5H1.1 (noting age "may be relevant" only if "present to an unusual degree"). And although a defendant's criminal record is relevant to "determining the applicable criminal history category," *id.* § 5H1.8, it is usually not a proper reason for a variance precisely because the Guidelines already take it into account. *See Warren*, 771 F. App'x at 642 (explaining that a variance based

---

[3]The lone exception is Boucher's military service, which "may be relevant" under the Guidelines if it is "present to an unusual degree." USSG § 5H1.11. That was arguably the case here—Boucher served in the Army for eight years and achieved the rank of Major.

on the defendant's criminal history risks creating "unwarranted sentence disparities" between the defendant and "other offenders in the same criminal history category" (citation and internal quotation marks omitted)); *see also United States v. Kirchhof*, 505 F.3d 409, 415 (6th Cir. 2007) ("[The defendant's] lack of prior criminal history was already taken into account in calculating his guidelines range, and according to the advisory policy statements contained in the guidelines, his other personal characteristics are 'not ordinarily relevant.'" (citation omitted)).

These factors are disfavored for good reason. To prioritize a defendant's education, professional success, and standing in the community would give an additional leg up to defendants who are already in a privileged position. Indigent defendants are less likely to impress a sentencing court with their education, employment record, or local reputation. But they are no less deserving of a reasonable and compassionate sentence. That is why Congress and the Guidelines oppose a class-based system where accumulated wealth, education, and status serve as credits against a criminal sentence. *See, e.g.*, *Musgrave*, 761 F.3d at 608 (cautioning district courts not to rely on factors that "would tend to support shorter sentences in cases with defendants from privileged backgrounds" (citation omitted)); *Peppel*, 707 F.3d at 641 ("[W]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose." (citation and internal quotation marks omitted)).

This is not to say that sentencing courts are prohibited from weighing factors disfavored under the Guidelines. These factors may, for example, still "be relevant insofar as they bear some connection to permissible considerations." *United States v. Stall*, 581 F.3d 276, 289 (6th Cir. 2009). A defendant's personal or professional success after his last incarceration, while not always relevant in isolation, might demonstrate an honest effort to turn his life around. *Cf. United States v. Collington*, 461 F.3d 805, 809 (6th Cir. 2006) (citing with approval the sentencing court's discussion of the defendant's "desire to reform"). But while "the fact that a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the guidelines," Section 3553(a)(5) still "requires that the district court consider applicable policy statements issued by the Sentencing Commission, and the Guidelines' disfavored view toward [these factors] is, therefore, relevant to our reasonableness review." *Christman*, 607 F.3d at 1119 (citations omitted). The district court

did not acknowledge that Congress and the Guidelines view these factors with suspicion or explain what unusual circumstances justified relying on them here. These simple markers of privilege did not warrant an extreme variance in Boucher's case. *See id.* (holding that the district court erred by citing the defendant's "educational background and skill" as mitigating factors without identifying what "unusual circumstances" warranted reliance on those factors); *Kirchhof*, 505 F.3d at 415 ("Kirchhof offers no reason why these [disfavored] characteristics . . . are unusually relevant in his case.").

### 4. Unwarranted Sentence Disparities

The last key factor is the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). This consideration touches on all of the § 3553(a) factors discussed above—the better the district court's explanation for its individualized, fact-driven sentence, the lesser the risk that the sentence will create unjustified disparities. But if the district court gives unreasonable weight to one or more of these factors, the danger of unwarranted disparity increases in tandem. *See Peppel*, 707 F.3d at 639–40; *see also United States v. Henry*, 545 F.3d 367, 386–87 (6th Cir. 2008) ("In sum, there is no means for judges [to] avoid such disparities in the first instance, or correct them on review, without demanding that substantial variances be supported by substantial reasons." (citation and internal quotation marks omitted)).

We first distinguish between disparities that matter and those that do not. At sentencing, Boucher urged the court to consider the 30-day sentence that first-time offenders may receive when they plead guilty to Fourth Degree Misdemeanor Assault under Kentucky law. Although the court gave Boucher a 30-day sentence, it did not say that it had calculated Boucher's prison term by reference to the sentence he might have received under Kentucky law. At any rate, "it is impermissible for a district court to consider the defendant's likely state court sentence as a factor in determining his federal sentence." *United States v. Malone*, 503 F.3d 481, 486 (6th Cir. 2007). Because state courts may sentence defendants according to their own criteria without reference to the Guidelines, permitting federal courts to rely on state-court criteria would "enhance, rather than diminish, disparities" among similarly situated federal defendants. *Id.* And even if consideration of Boucher's potential Kentucky sentence were proper, the Warren County Attorney testified that misdemeanor assault charges are appropriate for only "minor"

injuries, and she did not know "the extent of [Paul's] injuries" when she initially charged Boucher with Fourth Degree Misdemeanor Assault. The Commonwealth Attorney's review of the case was incomplete when federal agents intervened. It is clear that Paul's injuries—which included six broken ribs, a damaged lung, bouts of pneumonia, and chronic back pain—were more than minor.

The only disparities relevant in this case are those among federal defendants on a national scale. In its submission to the district court before sentencing, the Government cited over a dozen examples of defendants sentenced for assault under federal law. Only three of those cases involved violations of the statute at issue here, 18 U.S.C. § 351(e). In the first two, each defendant received a 30-day sentence for throwing eggs at a congressman during a campaign event (the eggs missed). *See United States v. Guerrero*, 667 F.2d 862, 864–65 (10th Cir. 1981); *United States v. Calderon*, 655 F.2d 1037, 1038 (10th Cir. 1981). In the third, the defendant received a 15-day sentence for spitting on a senator at an airport. *See United States v. Masel*, 563 F.2d 322, 322–23 (7th Cir. 1977). These prison terms were similar to Boucher's, but the offense conduct was quite different—as the Government argues, "it is difficult to understand why a tackle resulting in long-term serious injuries warrants the same sentence as an egg toss or spit in the face." While that is true, those three cases occurred roughly 40 years ago, before the Sentencing Commission or the Guidelines even existed. Their age and limited number make them less helpful to our analysis.

The more telling comparators are in cases drawn from other federal assault statutes. The Government cites, for example, several cases involving "assault resulting in serious bodily injury within U.S. territorial jurisdiction," 18 U.S.C. § 113(a)(6), and others involving "assaulting, resisting, or impeding" federal officers, 18 U.S.C. § 111. Some of these defendants had lengthy criminal records, making their sentences irrelevant. *See* 18 U.S.C. § 3553(a)(6) (noting that courts should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). But others involved defendants who, like Boucher, had a criminal history category of I. Three occurred on Native American reservations and resulted in sentences of 48 months, 41 months, and 43 months, respectively. *See United States v. Barrera*, 628 F.3d 1004, 1006 (8th Cir. 2011); *United States v. Ravensborg*, 776 F.3d

587, 587–88 (8th Cir. 2015); *United States v. Sayers*, 580 F. App'x 497, 498 (8th Cir. 2014).  In the remaining two, one defendant received a 24-month sentence for pushing a door into the arm of a government doctor, *see United States v. Clayton*, 615 F. App'x 587, 588–91 (11th Cir. 2015), and the other received a 21-month sentence for giving a customs officer a bloody nose and ear during a "brief melee" on a cruise ship.  *United States v. Gutierrez*, 745 F.3d 463, 466–69 (11th Cir. 2014).

National statistics tell a similar story.  *Cf. United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012) (explaining that national sentencing data released by the Commission should serve as "a starting point for district judges in their efforts to avoid unwarranted sentence disparities") (citation and internal quotation marks omitted).  The most recent Commission data shows that federal defendants with a criminal history category of I who were convicted of assault received an average sentence of 26 months' imprisonment and a median sentence of 21 months. *See* U.S. Sentencing Commission, Length of Imprisonment for Offender in Each Criminal History Category by Primary Offense Category, Table 14 (2017), https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table14.  And those with the lowest criminal history category who were sentenced under the guideline at issue here, § 2A2.2, received an average sentence of 37 months' imprisonment and a median sentence of 27 months.  *See* U.S. Sentencing Commission, Length of Imprisonment for Offender in Each Criminal History Category by Primary Sentencing Guideline, Table 14G (2017), https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table14G.

Despite these comparators, the district court failed to address the risk of sentence disparities.  Of course, a sentence may be substantively reasonable even when the court does not squarely address this factor.  *See Gall*, 552 U.S. at 54 (suggesting we may infer that the court considered this factor if the record otherwise shows that it "carefully reviewed the Guidelines range").  But the risk of disparity is more acute in mine-run cases like this one.  And that risk intensifies when the defendant receives a sentence well outside the Guidelines range.  The unremarkable nature of this case—coupled with the court's substantial variance from the Guidelines—warranted a more careful discussion about the relationship between Boucher's sentence and the danger of unjustified disparities.

### III.  CONCLUSION

In a mine-run case like this one, we apply "closer review" to any variance from the Guidelines. *Kimbrough*, 552 U.S. at 109 (quoting *Rita*, 551 U.S. at 351).  And our review here reveals no compelling justification for Boucher's well-below-Guidelines sentence.  *Gall*, 552 U.S. at 50.  Boucher may or may not be entitled to a downward variance after the district court reweighs the relevant § 3553(a) factors, and it is the district court's right to make that decision in the first instance.  *See United States v. Johnson*, 239 F. App'x 986, 993 (6th Cir. 2007) ("This Court takes no position on what an appropriate sentence in this case might be and notes that on remand the district court still retains ample discretion to grant a variance. . . .  The narrow reason for remand here is that the extreme nature of the deviation, without a correspondingly compelling justification, resulted in a substantively unreasonable sentence.").  We therefore **VACATE** Boucher's sentence and **REMAND** for resentencing.