NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0093n.06

No. 24-3110

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Feb 14, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
|  | ) | DISTRICT OF OHIO |
| AIMENN PENNY, | ) | |
|     Defendant-Appellant. | ) | OPINION |
|  | ) | |
|  | ) | |

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

**CLAY, Circuit Judge.** Aimenn Penny pleaded guilty to obstruction of persons in the free exercise of religious beliefs in violation of 18 U.S.C. § 247(a)(2) and (d)(3), and to committing a federal felony using fire in violation of 18 U.S.C. § 844(h)(1). On the obstruction count, the district court imposed a sentence of 96 months' imprisonment, reflecting an upward variance from the Sentencing Guidelines. Pursuant to § 844(h), the district court ordered that this sentence be served consecutively to the mandatory 120-month sentence it imposed on the arson count, resulting in a total sentence of 216 months' imprisonment. Penny appeals his sentence, arguing that it is substantively unreasonable. We affirm Penny's sentence for the reasons set forth below.

## I. BACKGROUND

On March 25, 2023, 20-year-old Aimenn Penny attacked the Community Church of Chesterland ("CCC") in Chesterland, Ohio, by throwing Molotov cocktails at the church building. CCC planned to host two events featuring drag queens, including a drag story hour for children,

on April 1, 2023. Penny, who holds transphobic views, learned of the upcoming drag performances, and felt that he had to attack CCC to stop the drag performers, who he perceived to be transgender, from "grooming kids." PSR, R. 33, Page ID #261–62. Penny planned his attack, building Molotov cocktails—incendiary devices consisting of bottles filled with flammable liquid attached to a means of ignition—and scoping out the church. The night of the attack, he became incensed after watching internet videos of a show in France that, according to Penny, depicted transgender people undressing in front of children. He drove over fifty miles from his home in Alliance, Ohio, to CCC in Chesterland, Ohio. Between 12:00 AM and 2:00 AM on March 25, 2023, Penny lit his homemade Molotov cocktails and threw them at the church building, scorching the exterior of the church. He also damaged a sign on CCC's property.

Ultimately, Penny's efforts to stop the drag performances were unsuccessful. CCC held the drag events as scheduled. However, because of Penny's actions, the church incurred nearly $30,000 in costs employing security for the events, installing a security system, and repairing damage to the church building. Additionally, in the wake of the attack, a preschool that rented space from CCC vacated the premises, costing the church $6,300 per year in lost income.

An investigation of the attack against CCC quickly led to Penny, who took responsibility for the attack online. The Federal Bureau of Investigation ("FBI") identified Penny as a member of White Lives Matter of Ohio, a group with white supremacist, pro-Nazi, and homophobic views. Earlier in March 2023, Penny participated with White Lives Matter in a protest of a local drag queen story hour in Wadsworth, Ohio. Protestors "showed up at the event carrying swastika flags and shouting racial and homophobic slurs and 'Heil Hitler.'" *Id.* at Page ID #257 (internal quotation marks omitted).

In interviews with the FBI, Penny admitted to attacking CCC and gave several statements confirming his motive. Chiefly, Penny stated that he attacked CCC to send a message and to intimidate; he wanted to indicate that the drag performers were "not welcome here, they're not welcome to mess with kids." *Id.* at Page ID #261 (internal quotation marks omitted). He said he was "tired of seeing all these drag events and people just not doing anything." *Id.* (internal quotation marks omitted). He expressed no remorse for the attack. Instead, Penny told interviewers that he would have felt better if the Molotov cocktails burned the entire church to the ground. But he had a feeling of "accomplishment" from attacking the church because it brought attention to his cause, and he felt like he was "doing God's work." *Id.* (internal quotation marks omitted). However, Penny stated that he chose to attack CCC in the early morning hours because he did not want to physically harm people. He just wanted his "message to get se[n]t." *Id.* (internal quotation marks omitted). Penny stated that if he had evidence of another situation where "they were 'grooming kids,'" he would launch another attack. *Id.* at Page ID #262 (internal quotation marks omitted).

Searches of Penny's car and home recovered items Penny described as used in the construction of the Molotov cocktails he threw at CCC, including gas cans, painters' tape, Styrofoam, lighters, and lighter fluid. In addition, items local police recovered from CCC after the explosions—including a vodka bottle, Corona beer bottle, blue plastic spray bottle filled with gasoline, and microfiber rags—matched items that Penny stated he used in the attack. In the searches officers also recovered firearms, ammunition, Nazi memorabilia, a White Lives Matter of Ohio t-shirt, and an ideological manifesto presumably written by Penny.

On March 31, 2023, Penny was arrested on a federal criminal complaint charging him with the malicious use of explosive materials and receiving or possessing a destructive device. In early

April 2023, while in custody on these charges, Penny attempted to transmit messages inciting further violence at the site of an upcoming drag performance. Penny wrote a sixteen-page manifesto, titled "The Demands of our Blood," detailing his white supremacist and transphobic ideology and rationalizing his attack on CCC. Manifesto, R. 33-11. The manifesto contains a general "Call For War" for white men to fight against Jewish people and marginalized groups. *Id.* at Page ID #339–40. Most relevantly for our purposes, it also contains a specific call for readers of the manifesto to attack a local theater scheduled to host a drag performance. The manifesto instructed:

> Our mission is pure—our purpose has been revealed.
>
> [W]e must take pure action against the []Akron[] Civic theatre [] []April 29th, 2023 and the tranny scum who threaten the innocence and future of our children—no more simple protests, no more meek rallies—Arm up, set these wretched buildings of wood and stone alight—show them who to fear. No longer shall we suffer the degenerate to live—Now is the time to fight, to die, and to live again—
>
> For our children.
>
> For our Folk.
>
> For our Progeny.
>
> Gather the bottles, gather the fuel.
>
> Collect your ammunition my friends, load up—For it is time to show the hyenas and the jackals just who the true Lions are.
>
> Bear your fangs, my brethren—remind them what true fear looks like.

*Id.* at Page ID #330. Penny attempted to send the manifesto outside of the correctional facility where he was held, but authorities intercepted the communication.

Around the same time he penned the manifesto, Penny wrote a letter to White Lives Matter and the Blood Tribe, another white supremacist group. In the letter, Penny wrote:

4

My friends, my brothers—You know who I am, and I bring a message of great importance—The man who brings you this message is a friend and an ally—I trust him just as I trust you, and a great day of action is almost upon us—Gear up for April 29th 2023—for the world shall see us this day. The call for Blood has been made, and blood shall flow that day. Prepare, and make your peace—Fire and ammo, Blood and Bone. . . .

Brothers, our time is <u>now</u>. For too long has the degeneracy festered within our streets—For too long have our children's cries fallen on deaf ears—and for too long have the wi[c]ked and the unnatural lived without fear.

In your hearts, you all know what must be done—And the answer to our Nation's problem is not "rallying" or "protesting"—It is great violence, for only that will erase the filth, for only that will set our people <u>free!</u>

Show them the Fangs of Retribution—<u>Tooth and nail</u>, <u>Blood and Bone.</u>

They have drawn first blood—<u>PAY THEM IN FULL.</u>

Our Great RECLAIMATION [sic] has begun.

Letter, R. 33-10, Page ID #327–28. Penny included a notation to the letter stating "Akron Civic Theatre April 29th, 2023—The Fire shall Rise, and God's Fury shall be remembered by <u>ALL</u>." *Id.* at Page ID #327. He also included a recipe for Molotov cocktails with the note "Enjoy results" and a swastika. *Id.* This letter was also intercepted when Penny attempted to transmit it from jail.

On April 20, 2023, Penny was charged in a four-count federal indictment with obstruction of persons in the free exercise of religious beliefs in violation of 18 U.S.C. §§ 247(a)(2), (d)(3) (Count 1); using fire to commit a federal felony in violation of 18 U.S.C. § 844(h)(1) (Count 2); maliciously damaging and destroying, by means of fire, property used in interstate commerce in violation of 18 U.S.C. § 844(i) (Count 3); and receiving or possessing a destructive device in violation of 26 U.S.C. §§ 5822, 5845(a)(8), 5845(f), 5845(i), 5861(c), and 5871 (Count 4).

On October 23, 2023, Penny pleaded guilty to Counts 1 and 2. In his plea agreement, the parties noted that Penny was to receive a mandatory 120-month sentence of imprisonment on Count 2, to be served consecutively to any sentence the district court imposed on Count 1. On

Count 1, the parties stipulated that Penny's base offense level under the Sentencing Guidelines was 24. The base offense level was calculated pursuant to U.S.S.G. § 2H1.1 (2023) (dictating that for offenses involving individual rights, apply "the offense level from the offense guideline applicable to any underlying offense" if greater than offense levels otherwise specified) and U.S.S.G. § 2K1.4(a)(1)(B) (2023) (dictating a base offense level of 24 for arson offenses or offenses of property damage by use of explosive that involve the attempted destruction of a place of public use). Because Penny's crime carried a hate crime motivation, the plea agreement included a three-level enhancement per U.S.S.G. § 3A1.1(a) (2023). And because Penny accepted responsibility for his conduct, in part by pleading guilty, the plea agreement included a three-level reduction pursuant to U.S.S.G. § 3E1.1(a) and (b) (2023), anticipating his final offense level to be 24. Despite stipulating to the offense-level computation, the parties recognized "that the advisory guideline range will be determined by the Court at the time of sentencing, after a presentence report has been prepared" and that "the Court may depart or vary from the advisory guideline range" in imposing a sentence. Plea Agreement, R. 25, Page ID #76. And the parties stipulated that they had "no agreement about the sentencing range to be used or sentence imposed in this case," and that "[e]ach party [wa]s free to recommend whatever sentence [it] believe[d] to be appropriate." Plea Agreement, R. 25, Page ID #76.

Prior to sentencing, the United States Probation Department ("Probation") prepared a presentence investigation report ("PSR") that determined Penny had one criminal history point, corresponding to criminal history category I. With a criminal history category of I and an offense level of 24, the plea agreement would impose a sentence of 51 to 63 months on Count 1, along with the mandatory consecutive 120-month sentence on Count 2.

6

The district court sentenced Penny on January 29, 2024. As to Count 2, the court recognized that the arson statute, 18 U.S.C. § 844(h), mandated a 120-month term of incarceration, imposed consecutively to the sentence on Count 1. The court reviewed the Guidelines calculation stipulated to in the plea agreement and calculated in the PSR, and agreed with the base offense level calculation of 24. The court then found, beyond a reasonable doubt, that the three-level enhancement for hate crime motivation applied. The court stated that "[t]his was a hate crime" because Penny would not have committed the offense "but-for the actual or perceived gender orientation or gender identity" of participants in CCC's scheduled events. Sent'g Hr'g Tr., R. 37, Page ID #363. In making this determination, the court noted that it relied on the plea agreement, presentence report, and statements noted within the presentence report in which Penny spoke about the transgender community. But the court stated that it was not relying on Penny's participation in prior protests, because it was not "punish[ing] [him] for his thoughts, beliefs, or his protected speech." *Id.* at Page ID #363–64.

After making the hate crime finding, the court reduced Penny's offense level by three for acceptance of responsibility, on the government's motion. It accepted Probation's calculation of one criminal history point and calculated Penny's Guidelines range at 51 to 63 months of imprisonment on Count 1. Neither party objected to the court's Guidelines calculation. The court then adopted the PSR in full.

After establishing Penny's Guidelines range, the court heard testimony and argument on the sentencing factors enumerated in 18 U.S.C. § 3553(a). Members of CCC, and the church's pastor, spoke of the impact Penny's attack had on their community and sense of safety. Penny then addressed the court and reiterated his "justification" for the attack: That he was protecting

7

children, because "men should not dress up as females in front of kids . . . especially in a public place of worship, supposed worship, of a God that is against such things." *Id.* at Page ID #381.

The government asked for the district court to vary upward from Penny's Guidelines range and impose a sentence of 120 months' imprisonment on Count 1, for a total sentence of 240 months' imprisonment. In response, defense counsel asked the court to impose a within-Guidelines sentence on Count 1, or "if the Court does feel that a variance is proper, to increase it maybe a little bit, but certainly not to the full ten years," considering Penny's difficult childhood, his youth, and the minimal damage done to CCC.

The court addressed the 18 U.S.C. § 3553(a) sentencing factors, including the nature and circumstances of Penny's offense. It noted "several things . . . in mitigation" regarding Penny's personal history and characteristics, including his young age, minimal criminal history, gainful employment, his childhood in a "tumultuous environment," and indications that he suffered from mental health issues and potential marijuana abuse. *Id.* at Page ID #383–84. Ultimately, however, the court found that the § 3553(a) factors justified the imposition of a 96-month sentence on Count 1, reflecting a 33-month upward variance from the top of Penny's Guidelines range and a 216-month total sentence of imprisonment.

In making this determination, the court gave "a great deal of thought to the [§] 3553(a) factors." *Id.* at Page ID #387–88. It determined that Penny's case was "outside the heartland of cases that would warrant a within-guidelines sentence on Count 1" given Penny's efforts to "continue [his] campaign of violence while detained" and the suggestion that he would engage in "similar violent conduct in the future." *Id.* at Page ID #388–90. The court noted that Penny showed a consistent lack of remorse, that he "st[ood] by the reasons" for his attack on CCC, and thus "appear[ed] to only be on a course to do it again." *Id.* at Page ID #389. Therefore, the court

"var[ied] upwards to reflect that [Penny] [didn't] intend to stop and . . . continued as this case has been ongoing." *Id.* at Page ID #390.

The government did not object to the court's sentence. Penny objected to the sentence, through counsel, on the grounds that the court "went outside the guidelines." *Id.* at Page ID #395.

## II. DISCUSSION

### A. Standard of Review

We review district court sentencing determinations for reasonableness. *United States v. Nichols*, 897 F.3d 729, 736 (6th Cir. 2018). The reasonableness inquiry has both procedural and substantive components. *Gall v. United States*, 552 U.S. 38, 51 (2007). Penny challenges only the substantive reasonableness of his sentence.[1] This Court reviews the substantive reasonableness of a sentence imposed by the district court under an abuse-of-discretion standard, even when the sentence imposed is outside the defendant's Guidelines range. *Id.* Under this standard, the fact that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

---

[1] Embedded in Penny's arguments about substantive reasonableness, however, is a procedural reasonableness argument. A sentence is procedurally unreasonable if, among other errors, the district court fails to consider the 18 U.S.C. § 3553(a) factors. *Nichols*, 897 F.3d at 737 (6th Cir. 2018). Penny argues that in sentencing him, the district court ignored the factor enumerated in 18 U.S.C. § 3553(a)(6), "the need to avoid unwarranted sentence disparities," because his sentence on Count 1 was significantly higher than the average and median sentences received by the six defendants sentenced between 2018 and 2022 with the same primary guideline of U.S.S.G. § 2K1.4, final offense level of 24, and criminal history score of I. **(Appellant's Br., ECF No. 32, 17).** Because Penny objected to his sentence, we review this challenge for an abuse of discretion. *See United States v. Hymes*, 19 F.4th 928, 932–33 (6th Cir. 2021). Penny's challenge fails. We assume that that when a district court correctly calculates a defendant's Guidelines range, it "necessarily take[s] into account the need to avoid unwarranted sentence disparities, viewed nationally." *United States v. Houston*, 529 F.3d 743, 754 (6th Cir. 2008). Penny does not argue that the district court improperly calculated his Guidelines range, he argues only that his sentence was out-of-joint with similar defendants nationwide. But the district court had access to the same national sentencing statistics that Penny did via the PSR, and therefore, we assume that it considered the nationwide profile in sentencing Penny.

## B. Analysis

In reviewing for substantive reasonableness, this Court "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* "For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (internal quotation marks omitted). And, as we stated in *United States v. Rayyan*,

> A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals) or too short (if the government appeals). The point is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness. It's a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual.

885 F.3d 436, 442 (6th Cir. 2018). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

Further, while sentences that fall within a defendant's Guidelines range are presumed reasonable, we do not apply the same presumption to outside-Guidelines sentences. *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009). However, a sentence that falls outside a defendant's Guidelines range "is not per se or even presumptively unreasonable." *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019) (internal quotation marks omitted).

A defendant's "Guidelines range represents the starting point for substantive-reasonableness review because it is one of the § 3553(a) factors and because the Guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors." *United States v. Warren*, 771 F. App'x 637, 641 (6th Cir. 2019) (internal quotation marks omitted). In reviewing the district

court's variance, we consider the extent that the court deviated from the defendant's Guidelines range and "ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "The farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) must be." *United States v. Aleo*, 681 F.3d 290, 299 (6th Cir. 2012) (internal quotation marks omitted). In assessing the court's justification for the variance, "a key question is whether the defendant's case falls within 'the "heartland" to which the Commission intends individual Guidelines to apply.'" *Boucher*, 937 F.3d at 709 (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). "When a district court varies outside the guideline range . . . we expect the court to explain what distinguishes that defendant's case from a typical one." *Id.* at 708. "If the district court reasonably explains why the defendant's unique circumstances fall outside the 'heartland' of cases affected by the relevant guideline, then the 'court's decision to vary . . . may attract greatest respect.'" *Id.* (quoting *Kimbrough*, 552 U.S. at 109). "But 'a sentence that [varies] from the advisory range in a "mine-run case" warrants "closer review."'" *Id.* at 709 (quoting *Herrera-Zuniga*, 571 F.3d at 582). "A mine-run case is . . . a normal case under the governing Guidelines range, which is calculated to incorporate the crime at issue, the offense level, and the criminal history category based on prior offenses." *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020).

In this case, the district court compellingly justified Penny's circumstances as outside the mine run of cases contemplated by the Guidelines, primarily because of Penny's attempts to orchestrate additional explosive attacks on the Akron Civic Theatre. As a consequence, the district court's decision to vary upward is entitled to our greatest respect.

As the district court recognized, Penny's case falls outside of the mine run. Penny's Guidelines range on Count 1 was determined pursuant to U.S.S.G. §§ 2K1.4(a)(1)(B), 3A1.1(a),

11

and 3E1.1(a), (b) (2023). Section 2K1.4(a)(1)(B) accounted for Penny's offense conduct, his "attempted destruction of a . . . place of public use" by arson or the use of explosives. Section 3A1.1(a) accounted for Penny's motive in the attack against CCC, his hatred toward transgender people or people he perceived to be transgender, by incorporating a three-level increase upon the district court's finding of hate-crime motivation. And Penny received a three-level reduction for acceptance of responsibility under § 3E1.1(a) and (b), reflecting that he promptly admitted to the offense conduct and pleaded guilty.

None of these Guidelines provisions accounted for Penny's attempts, while incarcerated on the instant offenses, to encourage or orchestrate an additional attack on the Akron Civic Theatre. The court specifically distinguished Penny's case as "outside the heartland" of within-Guidelines cases because of his encouragement of additional violence. Sent'g Hr'g Tr, R. 37, Page ID #390. And although the court calculated Penny's Guidelines range with a three-level reduction for acceptance of responsibility because he had "accepted responsibility, as the guidelines define it," the court acknowledged that the Guidelines failed to account for Penny's lack of remorse. *Id.* at Page ID #388. The court reasonably viewed these circumstances as removing Penny's case from the mine-run of like U.S.S.G. § 2K1.4(a)(1)(B) cases. *Cf. Perez-Rodriguez*, 960 F.3d at 755 (concluding that the defendant's case was within the mine run, and the district court's reasons for its upward variance already reflected in his Guidelines range, when the defendant's Guidelines sentence for illegal reentry incoporated his criminal history and the defendant's conduct and characteristics were typical of other illegal reentry cases).

Penny's attempted incitement of further violence, and his related lack of remorse, constitute sufficiently compelling reasons for the district court's upward variance. In using these circumstances to justify its upward variance, the district court "tied its sentence to identifiable

factors" under § 3553(a). *United States v. Fievet*, 808 F. App'x 358, 365 (6th Cir 2020). At the sentencing hearing, it discussed Penny's conduct in relation to the "need for the sentence imposed," and acknowledged its responsibility to consider "just punishment, promoting respect for the law, affording adequate deterrence to you and to others who may want to engage in similar conduct, [and] protecting the community." Sent'g Hr'g Tr., R. 37, Page ID #384. Its imposition of an upward variance based on Penny's continued violent conduct reflected these considerations, particularly the need to afford adequate deterrence and protect the community.

These considerations are compelling justifications for imposing an upward variance, and we have upheld upward variances in similar circumstances. For example, in *Rayyan*, this Court upheld an upward variance that was based on the district court's reasoning that the sentence was necessary "due to the risk [Rayyan] posed to the public, the need to deter others from engaging in similar conduct, and the severity of [Rayyan's] crime." 885 F.3d at 440. The upward variance in *Rayyan*—a 39-month variance from the 21-month top of Rayyan's Guidelines range—was more significant than the variance imposed in Penny's case. *See id.* But we found it to be "stiff, but reasonable" where Rayyan, who "had an affinity for the [extremist group] Islamic State," "repeatedly broke federal law to obtain firearms, reveled online about the exploits of a terrorist group, and confided in others that he had planned to carry out violent attacks of his own." *Id.* at 439, 442–443.

Likewise, Penny's 96-month sentence on Count 1, which represents a 33-month variance from the top of his 63-month Guidelines range, was reasonable. Like *Rayyan*, the district court in Penny's case justifiably considered the risk that Penny would attempt to commit extremism-driven violence in imposing an upward variance. And, as in *Rayyan*, Penny's crimes were sufficiently severe to warrant an upward variance because Penny, undeterred by his incarceration for attacking

CCC, attempted to coordinate another arson attack on a public place. Penny's manifesto and other writings show that he had no intention of ceasing extremist violence.

Thus, the 96-month sentence imposed on Count 1 was not substantively unreasonable. The district court did not abuse its discretion and impose a sentence greater than necessary to comply with the purposes and principles of sentencing.

Penny resists this conclusion by arguing that the district court improperly weighed the § 3553(a) factors in determining his sentence. He argues that the district court placed too much weight on his lack of remorse, and too little weight on his acknowledgment of culpability and mitigating circumstances. These arguments are unavailing.

Considering Penny's first argument, even though the district court repeatedly emphasized Penny's lack of remorse, the district court "does not commit reversible error simply by 'attach[ing] great weight' to a single factor." *United States v. Thomas*, 437 F. App'x 456, 458 (6th Cir. 2011) (quoting *Gall*, 552 U.S. at 57). A defendant's remorselessness can be sufficient justification for a district court's imposition of an above-Guidelines sentence. *See id.* at 460 (affirming the district court's above-Guidelines sentence when a "main reason" for its upward variance was that the defendant failed to "demonstrate genuine remorse"). Although the district court referred to Penny's remorselessness in justifying the upward variance in this case, there is no indication that it improperly weighed this circumstance. Rather, the district court's decision to vary upward was driven by Penny's stated and demonstrated intention to incite violence against people he perceived to be transgender. In the district court's view, Penny's lack of remorse for the attack on CCC made it more likely that he would commit a similar crime in the future. The district court stated that because Penny "st[ood] by [his] reasons for" attacking CCC, he "appear[ed] to only be on a course to do it again." Sent'g Hr'g Tr., R. 37, Page ID #389. Therefore, it was not Penny's lack of

remorse, standing alone, that drove the district court's sentence, but how Penny's lack of remorse would influence his further incitement of violence. And, as discussed above, the district court was within its discretion in imposing an upward variance considering Penny's likelihood of committing further attacks. We find no error in the district court's related consideration of Penny's remorselessness.

Penny's second argument regarding the alleged substantive unreasonableness of his sentence—that the district court did not sufficiently weigh Penny's admission of guilt—is also unpersuasive. Penny argues that the district court erred in emphasizing his lack of remorse, when it should have considered the fact that he readily admitted his guilt of the attack on CCC. But the district court did consider Penny's ready admission of guilt. It applied a three-level reduction to his Guidelines score for acceptance of responsibility. The district court did not abuse its discretion in considering Penny's remorselessness despite the application of the acceptance-of-responsibility reduction. We have acknowledged that a defendant's "failure to take responsibility and lack of remorse" are two separate facts that a district court may consider in weighing the § 3553(a) factors. *United States v. Mitchell*, 681 F.3d 867, 885 (6th Cir. 2024). Consistent with this proposition, in an unpublished case this Court affirmed an above-Guidelines sentence where the district court "credit[ed] a defendant with a two-point deduction for acceptance of responsibility" but "later refer[red] to his failure to accept responsibility for his crime as a reason for his guidelines range sentence." *United States v. Sutton*, 387 F. App'x 595, 607 (6th Cir. 2010). It follows that the district court in this case was well within its discretion to both consider Penny's lack of remorse independently and to apply an acceptance-of-responsibility reduction, obviating Penny's implicit argument that the two considerations are incompatible.

Third, Penny argues that the district court "failed to give enough weight to the substantial mitigation" in his background in fashioning its sentence. Appellant's Br., ECF No. 32, 15. More specifically, Penny asserts that the district court failed to account for the fact that he "demonstrated positive pretrial adjustment" during his ten months in federal custody prior to sentencing. *Id.* at 16. But the record supports that the district court did consider mitigating circumstances in Penny's case. It invoked potentially mitigating factors, like Penny's difficult background, at least twice in discussing the § 3553(a) factors and its decision to impose an above-Guidelines sentence. Indeed, Penny's brief recites from the district court's comments at his sentencing hearing to outline the mitigating factors in his case. The district court gave great thought to the factors in mitigation but concluded that aggravating factors justified the imposition of an above-Guidelines sentence. For example, in considering Penny's youth, the court recognized "reference[s] to men of [his] age not having their brains fully developed," but acknowledged Penny "had a fully developed brain enough" to carry out the attack on CCC, understand the consequences of his actions, and stand by them anyway. *Id.* at #389. Penny does not provide a reason why the district court's reasoning fails to give proper weight to mitigation, other than to argue that his background counsels in favor of a shorter sentence. In making this argument, Penny is effectively asking this Court to rebalance the § 3553(a) factors to identify an alternate sentence. But "that is not our job under the deferential substantive-reasonableness test." *United States v. Holt*, 116 F.4th 599, 617 (6th Cir 2024) (rejecting the defendant's argument that "the district court focused too much on the serious nature of his murder and not enough on the mitigating factors" in crafting his sentence).

To the extent that Penny makes a specific argument as to why the district court underweighted mitigation, he argues only that it should have accounted for the fact that Penny demonstrated "positive pretrial adjustment," which, according to Penny, is noted in the PSR.

16

Appellant's Br., ECF No. 32, 16. The PSR reads only that Penny had "no incidents reported" while in federal custody before sentencing, reflecting a lack of disciplinary violations. PSR, R. 33, Page ID #256. The district court adopted the PSR in full. The court's failure to account for Penny's lack of disciplinary history in federal custody does not render the district court's decision to impose an upward variance an abuse of discretion, or Penny's sentence substantively unreasonable. Contrary to Penny's argument, a lack of "incidents reported" speaks little to Penny's capacity to reoffend when he also sent missives encouraging an attack on the Akron Community Theatre while in custody. The court was deeply perturbed by Penny's willingness to encourage further violence while detained, and as explained above, Penny's demonstrated proclivity to reoffend was a proper consideration in imposing the upward variance. Penny does not convincingly argue otherwise.

### III.    CONCLUSION

For the reasons set forth above, we find Penny's sentence substantively reasonable. Accordingly, we **AFFIRM** the judgment of the district court.