RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM B. MILLIRON,

*Defendant-Appellant*.

No. 19-3720

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:17-cr-00130-1—Jack Zouhary, District Judge.

Decided and Filed:  January 11, 2021

Before:  GUY, McKEAGUE, and LARSEN, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Manuel B. Russ, Nashville, Tennessee, for Appellant.  Ashley A. Futrell, UNITED STATES ATTORNEY'S OFFICE, Toledo, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

RALPH B. GUY, JR., Circuit Judge.  Defendant William B. Milliron crashed his mobile methamphetamine lab into a building after he led the U.S. Marshals and local police on a high-speed chase and threw Molotov cocktails at the pursuing vehicles.  He pleaded guilty to several charges in exchange for the dismissal of the remaining charges.  The district court sentenced Milliron to 110 months in prison (14 months above the Sentencing Guideline range).  On appeal,

Milliron attacks his plea agreement and challenges his sentence as procedurally and substantively unreasonable.  We AFFIRM.

**I.**

In February 2017, members of the United States Marshals Service in Ohio were searching for Milliron based on an outstanding arrest warrant from Florida.  The Marshals located Milliron driving his truck with a female passenger (later identified as his girlfriend).  The Marshals turned on their sirens and lights in an attempt to stop Milliron.  But Milliron did not stop.  He led the Marshals and local police on a reckless 35-mile chase at speeds of up to 65 miles per hour.

During the chase, Milliron hurled glass bottles and other items toward the vehicles of the Marshals and local police.  Milliron also attempted to ignite paper or fabric stuffed into plastic bottles filled with a liquid and then threw these makeshift Molotov cocktails at the vehicles pursuing him.  At least one of these plastic bottles hit a police vehicle's windshield and its contents exploded, impairing visibility for the officer driving.  Milliron later confessed that he threw these items at the pursuing vehicles to stop them from chasing him.

Milliron cut through parking lots and front yards, ignored red lights and stop signs, and swerved through traffic.  Two Marshals in a truck approaching from the opposite direction saw Milliron driving erratically toward them and pulled to the side of the road.  The chase eventually ended with Milliron hitting another vehicle and crashing his truck into a commercial building.

A search of Milliron's truck revealed that it was a mobile methamphetamine lab, containing several methamphetamine-related chemicals and paraphernalia.  Two of the plastic bottles Milliron threw from his vehicle during the pursuit were recovered and tested.  These "one-pot methamphetamine" bottles had a charred wick made of paper stuffed into the opening and contained flammable liquid and a combination of chemicals used to manufacture methamphetamine.  Milliron also had thirteen rounds of live firearm ammunition in his pants pocket.

In a seven-count indictment, Milliron was charged with:

(1) using a deadly or dangerous weapon to forcibly assault, resist, oppose, impede, intimidate, and interfere with federal officers performing their official duties, in violation of 18 U.S.C. § 111(a)(1) and (b);

(2) receipt or possession of a firearm (*i.e.*, a "destructive device") as defined in 26 U.S.C. § 5845(a) and (f), which was not registered to him, in violation of 26 U.S.C. § 5861(d);

(3) carrying and using a firearm (*i.e.*, a "destructive device"), during and in relation to a crime of violence (*i.e.*, "assault of a federal officer, and those assisting [f]ederal [o]fficers in the performance of their official duties"), in violation of 18 U.S.C. § 924(c)(1)(A) and (B)(ii);

(4) possession of equipment or products which may be used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6) and (d)(2);

(5) intent to manufacture approximately 4.7 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C);

(6) possession with intent to distribute 4.7 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C);

(7) being a felon-in-possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).

Although Milliron initially pleaded not guilty, he later changed his plea. Pursuant to a written plea agreement, Milliron pleaded guilty to Counts 1, 4, 5, and 7, and waived certain rights. In exchange, the government agreed to dismiss the other counts after sentencing.

Nearly five months later Milliron filed a motion to withdraw his guilty plea, in which "counsel acknowledge[d] that his representation . . . was deficient" because he had failed to explain that a conviction under 18 U.S.C. § 111(b) "requires that the defendant intended to cause injury." The district court denied the motion after analyzing it in terms of an ineffective-assistance-of-counsel claim.

In the presentence report (PSR), the Probation Office calculated Milliron's combined adjusted offense level as 25. This calculation included two sentencing enhancements relevant to this appeal: (1) a two-level offense enhancement for possessing a "dangerous weapon," USSG § 2D1.1(b)(1); and (2) a three-level offense enhancement because "a dangerous weapon (including a firearm) was possessed and its use was threatened," USSG § 2A2.4(b)(1)(B). After

a three-level reduction for acceptance of responsibility, Milliron's final offense level was 22. Milliron's offense level, combined with his Criminal History Category of V, yielded an advisory Sentencing Guideline range of 77 to 96 months of imprisonment.

At sentencing, the district court calculated Miliron's sentencing range consistent with the PSR. The court ultimately varied 14 months above the high-end of the range and sentenced Milliron to a total of 110 months of imprisonment. This timely appeal followed.

**II.**

As a threshold matter, Milliron contends that the district court abused its discretion by applying the incorrect legal standard in denying his motion to withdraw his guilty plea. The government maintains, however, that Milliron's appellate waiver bars review of this issue. We agree.

It is axiomatic that as part of a valid plea agreement, criminal defendants may "waive many of [their] most fundamental" legal rights, including their right to appeal. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995); *see also Class v. United States*, 138 S. Ct. 798, 804–05 (2018). A waiver provision is binding and forecloses appellate review if (1) the defendant's claim falls within the scope of the appeal waiver provision; and (2) the defendant "knowingly and voluntarily" agreed to the plea agreement and waiver. *See United States v. Toth*, 668 F.3d 374, 377–78 (6th Cir. 2012). Both requirements are met here.

**A.**

Milliron makes no effort to contest the first requirement. Notwithstanding that fact, the appeal waiver provision in question covers Milliron's plea withdrawal claim. Whether a claim raised on appeal falls within the scope of an appellate waiver is a question we review de novo, *United States v. Griffin*, 854 F.3d 911, 914 (6th Cir. 2017), applying "ordinary contract law principles and constru[ing] any ambiguities against the government," *United States v. Fowler*, 956 F.3d 431, 436 (6th Cir. 2020). The analysis here is simplified, however, as this court has firmly established that where a plea agreement states that the defendant waives the right to challenge their "conviction" on direct appeal, "an appeal of the denial of a motion to withdraw a

guilty plea is an attack on the *conviction*" and is therefore "subject to [the] appeal waiver provision." *Toth*, 668 F.3d at 378–79 (emphasis added); *United States v. Detloff*, 794 F.3d 588, 592 (6th Cir. 2015). This is true even when the appellate waiver "does not mention" plea withdrawal claims. *Toth*, 668 F.3d at 378.

As in *Toth*, under the appeal waiver provision in this case, Milliron waived his right to "appeal the sentence or conviction." Milliron only "reserve[d] the right to appeal" the four claims "specifically" referenced in the waiver provision, but a plea withdrawal claim is not one of them.[1] Because Milliron's plea withdrawal claim falls within the scope of the appeal waiver provision, only challenges to the validity of the plea agreement and the appeal waiver therein will be entertained. *See Detloff*, 794 F.3d at 592.[2]

**B.**

The plea agreement and appeal waiver in this case are valid. A defendant's plea agreement and related waivers are valid if made "voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). Milliron argues only that his guilty plea was not "knowing or intelligent" because he pleaded guilty to violating 18 U.S.C. § 111(a)(1) and (b) "without the requisite knowledge that, in order [to] be [found] guilty of the offense," the government must prove "that he had used [a deadly or dangerous weapon] with the intent to cause bodily injury." Were it true that neither the court nor his counsel informed him of the "essential elements of the crime," Milliron's plea and related waivers would be "constitutionally invalid." *Bousley v. United States*, 523 U.S. 614, 618–19 (1998); *Stumpf*, 545 U.S. at 183. But that is not the case here.

---

[1]Milliron only specifically reserved the right to appeal: (1) "any punishment in excess of the statutory maximum"; (2) "any sentence to the extent it exceeds the maximum of the sentencing imprisonment range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court"; (3) claims of "ineffective assistance of counsel"; and (4) claims of "prosecutorial misconduct."

[2]The government concedes that Milliron may appeal the Guideline calculation issues, discussed *infra* Section III.A., because "there were no 'sentencing stipulations and computations in th[e] agreement' that bound Milliron."

Milliron's argument hangs on a misreading of § 111(a)(1) and (b).**³** The text of "Section 111(a)(1) contains four distinct elements; the government must show that the defendant: (1) forcibly (2) assaulted, resisted, opposed, impeded, intimidated, or interfered with (3) a federal officer (4) in the performance of his duties." *United States v. Kimes*, 246 F.3d 800, 807 (6th Cir. 2001). "[T]o establish a violation of § 111(b), . . . the government must establish a violation of § 111(a) in addition to the use of a deadly or dangerous weapon or the 'inflict[ion] [of] bodily injury.'" *United States v. Rafidi*, 829 F.3d 437, 445 (6th Cir. 2016) (third and fourth alterations in original) (quoting *United States v. Gagnon*, 553 F.3d 1021, 1024 (6th Cir. 2009)). "[T]he crime established in 18 U.S.C. § 111(a) is a general intent crime," *Kimes*, 246 F.3d at 809, requiring only that a person "knowingly, consciously, and voluntarily committed an act which the law makes a crime"; it does not require "a showing of 'bad purpose,'" *id.* at 807 (emphasis omitted) (quoting *United States v. Kleinbart*, 27 F.3d 586, 592 & n.4 (D.C. Cir. 1994)); *see also United States v. Feola*, 420 U.S. 671, 684–86 (1975) ("[Section] 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. . . . [A]n actor must entertain merely the criminal intent to do the acts therein specified.").

As for § 111(b), however, it does not appear that this court has decided whether the statute speaks in terms of general or specific intent. *Cf. United States v. Bailey*, 444 U.S. 394, 406 (1980) (explaining "that the question of the kind of culpability required to establish the commission of an offense [should] be faced separately with respect to each material element of the crime" (citations omitted)); *Kimes*, 246 F.3d at 807.**⁴** In the only case cited by the government, the court did not decide the issue. *See United States v. Sanchez*, 914 F.2d 1355, 1359 (9th Cir. 1990) ("We need not decide whether specific intent to injure is required to find that a defendant used an object, such as a car, as a deadly weapon in an assault on a federal

---

**³**18 U.S.C. § 111(a)(1), in relevant part, makes it a crime for anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in [18 U.S.C. § 1114] while engaged in or on account of the performance of official duties." Subsection 111(b) increases the maximum penalty to twenty years of imprisonment for anyone who, "in the commission of any acts described in [§ 111(a)], uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury." 18 U.S.C. § 111(b).

**⁴**Milliron and the district court both relied on cases applying USSG § 2A2.2 and the definition of "dangerous weapon" under that sentencing enhancement. Milliron makes a similar argument here.

officer."). Other federal courts of appeal have addressed the question and concluded that § 111(b) does not contain a specific intent requirement. *United States v. Jackson*, 310 F.3d 554, 556 (7th Cir. 2002) ("[Section] 111(b) does not require proof of intent to injure."); *United States v. Arrington*, 309 F.3d 40, 45–46 (D.C. Cir. 2002) (rejecting the argument that the actor must "intentionally use the object as a weapon" and holding that § 111(b) simply requires the "intent to use the object" in the committing one of the acts in § 111(a), and that "the object be used in a deadly or dangerous manner" (emphasis omitted)); *United States v. Ettinger*, 344 F.3d 1149, 1154–58 (11th Cir. 2003). We now hold that 18 U.S.C. § 111(b) describes a general intent crime.

Section 111(b) does not contain specific intent language. When Congress "intends to create a specific intent crime, [it] explicitly says so." *Kimes*, 246 F.3d at 808 (citing 18 U.S.C. § 113(a)(3), which criminalizes "[a]ssault with a dangerous weapon, *with intent to* do bodily harm" (emphasis added)); *see also United States v. Veach*, 455 F.3d 628, 633 (6th Cir. 2006) (holding that "18 U.S.C. § 115(a)(1)(B) contains a specific intent element" because it states "[w]hoever threatens to assault, kidnap, or murder, a [federal] official, . . . judge, [or] law enforcement officer, . . . *with intent to* impede, intimidate, or interfere with such official . . . ., or *with intent to* retaliate against such official . . ." (emphasis omitted)). Absent from § 111(b) is the explicit phrase "with intent to" or similar language. Thus, despite Milliron's insistence, intent-to-harm is not an element of the offense under § 111(b). As a general intent statute, § 111(b) only requires that a defendant "knowingly" and "voluntarily" use a deadly or dangerous weapon. *See Kimes*, 246 F.3d at 807.

Milliron was well-informed of all the essential elements outlined above for a conviction under 18 U.S.C. § 111(a)(1) and (b). These elements were listed plainly in the plea agreement, including that Milliron "used a deadly or dangerous weapon" and "did so knowingly and intentionally." Milliron initialed the bottom of each page of the agreement and signed the agreement, acknowledging that he had read and discussed the entire plea agreement with his attorney. At the plea change hearing, the court read aloud the elements listed in the plea agreement and asked Milliron if he understood the charge and "all the elements associated with it," to which Milliron responded, "Yes, sir." The court also discussed the appeal waiver

provision with Milliron and explained that he would be "giving up" his appeal rights, except for those rights reserved in the waiver provision. After the court inquired whether Milliron understood, he replied, "Yes, Your Honor." Milliron, therefore, knowingly and voluntarily agreed to the plea agreement and appeal waiver.

Accordingly, the appeal waiver in this case bars review of Milliron's challenge to the denial of his motion to withdraw his guilty plea. His conviction stands.

**III.**

As for Milliron's sentence, he claims it is procedurally and substantively unreasonable. Sentences are reviewed for both procedural and substantive reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). Procedural reasonableness requires that the court "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall*, 552 U.S. at 51). Substantive reasonableness is a matter of whether "a sentence is too long," *id.* at 442; that is (to put it in statutory terms), the sentence imposed is "'greater than necessary' to achieve the purposes of sentencing," *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (citation omitted). A sentence is substantively unreasonable if "the court placed too much weight on some of the § 3553(a) factors and too little on others." *United States v. Boucher*, 937 F.3d 702, 707 (6th Cir. 2019) (quoting *United States v. Parrish*, 914 F.3d 1043, 1047 (6th Cir. 2019)). "The point [of substantive unreasonableness] is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness." *Rayyan*, 885 F.3d at 442; *see also Holguin-Hernandez*, 140 S. Ct. at 766.

**A.      Procedural Reasonableness**

Milliron argues his sentence is procedurally unreasonable because the district court improperly calculated his sentence range by including two specific sentencing enhancements under USSG §§ 2A2.4(b)(1)(B) and 2D1.1(b)(1). We need not decide whether Milliron preserved these issues by objecting at sentencing so as to avoid plain-error review because, even

under the less-deferential abuse-of-discretion standard of review, it is clear that the sentencing enhancements apply. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

The district court's interpretation of the Guidelines is reviewed de novo. *See United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012). But we "accept the findings of fact of the district court unless they are clearly erroneous and . . . give due deference to the district court's application of the Guidelines to the facts." *United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008) (quoting *United States v. Williams*, 355 F.3d 893, 897–98 (6th Cir. 2003)).

The challenged enhancements apply because the Molotov cocktails Milliron threw constitute "dangerous weapons." Where a conviction is obtained under 18 U.S.C. § 111, a three-level offense enhancement applies if "a dangerous weapon (including a firearm) was possessed and its use was threatened[.]" USSG § 2A2.4(b)(1)(B). Similarly, in connection with drug manufacturing or trafficking crimes, a two-level offense enhancement also applies "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1). Both enhancements incorporate the definition of "dangerous weapon" in Application Note 1 to § 1B1.1. *See* USSG § 2A2.4, comment., n.1; USSG § 2D1.1, comment., n.11(A). There, "dangerous weapon" is defined as:

> (i) an instrument *capable of inflicting* death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the *defendant used the object in a manner that created the impression* that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

USSG § 1B1.1, comment., n.1(E) (emphasis added). This court takes a "'functional approach' to 'what constitutes a dangerous weapon' under the Guidelines," meaning that "in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *United States v. Callahan*, 801 F.3d 606, 628 (6th Cir. 2015) (quoting *Tolbert*, 668 F.3d at 802-03). The controlling "question is an objective one": "[W]hether a reasonable individual would believe that the object is a dangerous weapon[,] *i.e.*, capable of inflicting

serious bodily injury under the circumstances." *Tolbert*, 668 F.3d at 801 (citations and brackets omitted).

In applying this standard, we have specifically held that a table was a dangerous weapon where the defendant had "used the table in a dangerous manner" when he hit "the victim's head into [the] table repeatedly." *United States v. Duke*, 870 F.3d 397, 402 (6th Cir. 2017). A plastic water pitcher was a dangerous weapon due to "the circumstances in which it was used (to strike someone in the head), . . . even though no such harm actually resulted." *Tolbert*, 668 F.3d at 803. And a size-15 boot worn by the defendant was also a dangerous weapon because he "used it 'in a dangerous manner'" by delivering "one kick" to the victim's torso. *United States v. Hickman*, 766 F. App'x 240, 247 (6th Cir. 2019).

Here, any reasonable person would believe that Molotov cocktails made from flammable chemicals are inherently "dangerous weapons" because such items are "capable of inflicting death or serious bodily injury." But even if that were debatable, Milliron clearly "used [the Molotov cocktails] in a dangerous manner." While driving up to 65 miles per hour, Milliron attempted to ignite these Molotov cocktails and then hurled them at the vehicles pursuing him, with at least one hitting a vehicle's windshield and its contents exploding. Therefore, the Molotov cocktails are "dangerous weapons" for purposes of §§ 2A2.4(b)(1)(B) and 2D1.1(b)(1).[5]

The district court's assignment of the three-level enhancement under § 2A2.4(b)(1)(B) is not, as Milliron contends, inconsistent with the court's decision not to apply a *separate* four-level enhancement for "aggravated assault" under USSG § 2A2.2(b). The court chose not to apply § 2A2.2 because of "uncertainty" as to the meaning of "felonious assault," due in part to the "lack of [a] definition" or "the lack of precedent." So the court decided "to err on the side of

---

[5]To the extent Milliron also challenges the application of the two-level enhancement under USSG § 2D1.1(b)(2), Milliron only references that provision in two headings in his appellate brief and merely alludes to § 2D1.1 in one sentence. It is well-settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (citation omitted); *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016). Nevertheless, for the same reasons that §§ 2A2.4(b)(1)(B) and 2D1.1(b)(1) apply, we also conclude that § 2D1.1(b)(2) is applicable because Milliron "used violence" when he threw Molotov cocktails at the law enforcement vehicles. *See* USSG § 2D1.1(b)(2), comment., n.11(B).

caution" and "apply the lower guideline enhancement" under § 2A2.4, as to "which there clearly [was] no doubt or dispute in this case that [it] applie[d]." It bears emphasis that the court reached this conclusion only after the parties filed sentencing memoranda and the court held three sentencing hearings focused on whether to apply the three-level enhancement for possessing and threatening to use a dangerous weapon under USSG § 2A2.4(b)(1)(B) or the separate four-level enhancement for aggravated assault under USSG § 2A2.2(b). And in his sentencing memorandum and at the sentencing hearings, Milliron argued that "application of [§] 2A2.2 is unwarranted," and, instead, Milliron "ask[ed] the court to impose a sentence in accordance with [§] 2A2.4." (R. 90, PageID 587; R. 110, PageID 820 ("we should be out from under [§] 2A2.2, and the applicable guideline should be [§] 2A2.4"); R. 113, PageID 879 ("[§] 2A2.2 is not the appropriate guideline; rather, [§] 2A2.4 is the appropriate guideline section.")). The district court did just that. Milliron cannot now claim error because the district court applied § 2A2.4 and not § 2A2.2.

Likewise, the mere fact that the district court found that Milliron did not use a "destructive device" for purposes of the enhancement under USSG § 2K2.1(b)(3)(B) does not mean that Milliron did not use a "dangerous weapon." The terms are different, carry different meanings, and will naturally lead to different results.[6]

The district court was correct to assign Milliron the sentencing enhancements under USSG §§ 2A2.4(b)(1)(B) and 2D1.1(b)(1).

---

[6]The definition for "destructive device," *see* USSG § 2K2.1, comment., n.1, is located under 26 U.S.C. § 5845(f), which defines the term as:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell . . . ; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, . . . or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845(f).

**B.       Substantive Reasonableness**

Milliron asserts that his 110-month prison sentence is substantively unreasonable because the district court varied above the Guideline range by 14 months. We disagree.

An above-Guidelines sentence is not presumptively unreasonable. *United States v. Thomas*, 933 F.3d 605, 613 (6th Cir. 2019). A district court is well within its discretion to vary from the advisory Guidelines "when the sentencing judge finds a particular case [falls] 'outside the heartland'" or "mine-run" of cases "to which the Commission intends individual Guidelines to apply.'" *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal quotation marks omitted) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). But a variance in a "mine-run case" warrants "closer review" of the district court's justifications. *See id.*; *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020). "While we consider 'the extent of any variance' as a data point, we 'give due deference to the district court's decision that the § 3553(a) factors' justify the variance." *Thomas*, 933 F.3d at 613 (quoting *Gall*, 552 U.S. at 51). "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51.

*First*, the district court reasonably concluded that this case does not fall in the "mine-run" of drug trafficking and assault cases. *See Perez-Rodriguez*, 960 F.3d at 754. This case is one-of-a-kind. As the district court remarked, "[t]his is not a heartland case" because "there isn't one [case]" like it and "[n]o one has shown me such a case" with similar facts. Considering that this case involved a 35-mile chase, high speed, reckless behavior, flammable objects thrown at law enforcement, and Milliron was "still resisting arrest" when they stopped him, the court concluded that "[a]ll of that points to something more egregious than what I'll call a run-of-the-mill case." We agree and accord the court's decision the "greatest respect." *Kimbrough*, 552 U.S. at 109.

*Second*, the district court's 14-month variance here was comparatively modest. *See, e.g.*, *Rayyan*, 885 F.3d at 439 (39-month variance); *Thomas*, 933 F.3d at 613 (collecting cases). The court's justifications also adequately support the variance. Contrary to what Milliron says, the district court did not consider conduct that did not result in a conviction, much less "excessively"

rely on such conduct. The court did not "even need to go there" to determine that Milliron's criminal history suggested that "a sentence outside the [G]uideline range on the upside" was warranted after summarizing Milliron's lengthy list of adult convictions across multiple states, including domestic violence and other offenses related to drugs and firearms.

Nor is there any support for Milliron's claim that the court "gave insufficient consideration" to his personal background. The court recounted in significant detail Milliron's personal background and understood "that he didn't have an idyllic upbringing." The court also went on to detail Milliron's mental, physical, and emotional health, and his educational, vocational, and special skills. In light of those facts, the court "temper[ed] [its] sentence a bit." But that did not change the court's finding that this was "a very serious crime" and that Milliron "was a violent offender, both on the day in question and previously." The court explained that Milliron lacked respect for the law, was undeterred by his previous encounters with the judicial system, and he endangered the public and the officers of the several agencies involved in chasing him. In the end, the court was "convinced," as are we, "that the [G]uideline range here does not and is not adequate to meet the 3553(a) factors." There is no reason to second-guess the district court's reasoned discretion to vary 14 months above the Guidelines.

\* \* \*

We affirm.