NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0591n.06

Case Nos. 20-6430/21-5014

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Dec 20, 2021
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,              )
                                       )
    Plaintiff-Appellee,                )
                                       )
v.                                     )
                                       )
RICHARD GRAHAM (20-6430); DUSTY        )
WILLIAM OLIVER (21-5014),              )
                                       )
    Defendants-Appellants.             )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

BEFORE: BOGGS, GIBBONS, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Dusty Oliver and Richard Graham preyed on homeless men. They drove their victims to Great Smoky Mountains National Park and raped them. Both pleaded guilty to two counts of aiding and abetting aggravated sexual assault. Now they claim their sentences were substantively unreasonable. We disagree and AFFIRM as to both.

I.

The thread begins in June 2012. That's when Oliver and Graham found their first victim, RP, walking along a highway near Knoxville, drunk and homeless. The pair of would-be rapists offered to drive RP to the Bristol Motor Speedway. RP was a racing fan, so he agreed and hopped into the back seat. But Oliver and Graham had something else in mind entirely. They drove RP to Great Smoky Mountains National Park instead. Once there, they led RP along the Appalachian Trail. They came upon a large rock. There, they "sandwiched RP" and simultaneously penetrated

his mouth and anus. (R. 25, Oliver Plea Agreement, PageID 53-54; R. 23, Graham Plea Agreement, PageID 39-40.) RP tried to resist, telling his rapists that "he did not want 'this' to happen." (R. 25, Oliver Plea Agreement, PageID 54; R. 23, Graham Plea Agreement, PageID 40.) But Oliver and Graham continued raping him anyway. After they finished, Oliver and Graham deposited RP at a gas station and drove off. RP reported the rape, but Oliver and Graham evaded the authorities.

That is, until three and a half years later. Oliver and Graham found themselves cruising on the same highway near Knoxville. And there, they located another victim (CN), a homeless drug addict. They invited CN to join them for a drive to Great Smoky Mountains National Park. Thinking he was in for "something cool"—nothing more than "some trip"—CN agreed. (R. 72, Oliver Sentencing Hr'g Tr., PageID 1929; R. 73, Graham Sentencing Hr'g Tr., Page ID 1966.) But the same thing happened all over again. The three men were walking down from Lookout Tower, on Look Rock Trail, when Oliver and Graham "sandwiched CN between them" and simultaneously penetrated him. They forced their hands and mouths on CN's penis as well. CN told his rapists to "stop" and "quit," but to no avail. (R. 25, Oliver Plea Agreement, PageID 55; R. 23, Graham Plea Agreement, PageID 41.) Afterwards, Oliver and Graham drove back to Knoxville and kicked CN out of the car. After all these years, CN told the court that he still "drink[s] [himself] to sleep three quarters of the day." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1929; R. 73, Graham Sentencing Hr'g Tr., Page ID 1966.) He "fight[s] . . . demons all the damn time." (*Id.*)

It so happened that CN took some pictures of Graham on his phone. Thanks in large part to these pictures and other information provided by CN, the police tracked down Oliver and Graham. Each was charged with two counts of aiding and abetting aggravated sexual assault on federal land, in violation of 18 U.S.C. §§ 2, 7(3), and 2241(a). Both pleaded guilty.

And although the government only charged Graham and Oliver with these two rapes, they were part of a larger pattern of conduct. As Oliver admitted, the pair would "ride around Knoxville, Tennessee, in their vehicle and look for homeless males who appeared to be drunk or under the influence." (R. 55, Oliver Presentence Report, PageID 1698-99; R. 40, Graham Presentence Report, PageID 178.) They had no fewer than 20 to 30 sexual encounters with homeless men between 2012 and 2017. Of these, at least four were sexual assaults, not including the rapes of RP and CN.[1]

Oliver's Guidelines sentencing range was 210 to 262 months' imprisonment. Graham's was 168 to 210 months' imprisonment. Both had a base offense level of 30. And they received the same enhancements: (1) four points because their offenses involved conduct described in 18 U.S.C. § 2241(a); (2) two points because they knew or should have known that their victims were vulnerable; and (3) two points because there were two victims. Oliver's Guidelines range was higher because he had a criminal history category of III; Graham had a criminal history category of I.

Both sought downward variances. Graham emphasized his difficult childhood, mental health challenges, and intellectual deficiencies. And he characterized Oliver as the primary aggressor. Oliver emphasized that his father sexually and physically abused him growing up. He also claimed that Graham "is the more culpable between the two." (R. 51, Oliver Mot., PageID 963.) The government, for its part, moved for upward variances. It argued that the facts were uniquely horrific so as to fall outside the heartland of typical cases.

---

[1] Graham disputes this last part. But Graham never objected to his presentence report, which contains this information. (R. 40, Graham Presentence Report, PageID 179.) In any event, whether there were two victims or six (or more) is not decisive to the resolution of this case.

After considering the 18 U.S.C. § 3553(a) factors, the district court granted the government its upward variances. It agreed that Oliver and Graham's conduct fell outside the heartland. The district court then sentenced Oliver to 300 months' imprisonment. This represented a fifteen percent upward variance. The court sentenced Graham to 230 months' imprisonment—an upward variance of ten percent. Both appealed.

II.

We afford "[a] district court's sentencing decision . . . 'great deference.'" *United States v. Nelson*, 918 F.2d 1268, 1275 (6th Cir. 1990) (quoting *United States v. Joan*, 883 F.2d 491, 496 (6th Cir. 1989)). More specifically, "[s]entences are reviewed for both procedural and substantive reasonableness under an abuse-of-discretion standard." *United States v. Milliron*, 984 F.3d 1188, 1195 (6th Cir. 2021). Oliver and Graham do not address procedure, so our focus is substantive reasonableness.

Importantly, our already-deferential standard of review becomes even more so here. That's because "in those cases that fall outside the Guidelines' 'heartland,' the district court's decision to deviate from the advisory range is entitled to the '*greatest respect*.'" *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009) (emphasis added) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). Or put another way, "[a] district court is well within its discretion to vary from the advisory Guidelines when the sentencing judge finds a particular case falls outside the heartland." *Milliron*, 984 F.3d at 1198 (internal quotations and alterations omitted).

The district court "reasonably concluded" that Oliver and Graham's conduct fell outside the heartland of typical cases. *Id.* In doing so, it emphasized several things. First, Oliver and Graham "intentionally and *with premeditation*" targeted "homeless men who appeared to be intoxicated or under the influence of drugs." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1950

(emphasis added); R. 73, Graham Sentencing Hr'g Tr., PageID 1992-93 (emphasis added).) They did this "in part to minimize the chances their crimes would go reported." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1950; *see also* R. 73, Graham Sentencing Hr'g Tr., PageID 1993.) Second, Oliver had admitted to sexually assaulting at least four other victims; his conduct was therefore part of a larger pattern.[2] Third, the court agreed with the government that "[p]eople in the community and tourists who come to visit should not be concerned about attacks occurring on hiking trails in the Great Smoky Mountains National Park." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1951.) And finally, the court emphasized that Oliver and Graham "raped each man physically two times [*i.e.*, simultaneously]." (*Id.*) Certainly, it's reasonable to conclude that premeditatively gang-raping victims in this way on hiking trails frequented by parkgoers is less than typical.

Graham's arguments to the contrary are not persuasive. He emphasizes that "[a] mine-run case is a normal offense for someone *with an offender's specific sentencing enhancements* and criminal history category." (Graham Reply at 2 (quoting *United States v. Lightning*, 835 F. App'x 38, 41 (6th Cir. 2020)).) That part is true enough, but it doesn't change the calculus. This is because neither the enhancements nor the criminal history categories—nor anything else in Oliver and Graham's Guidelines calculations for that matter—fully capture the district court's reasoning here.

More specifically, the Guidelines calculations do not address the district court's concern with protecting parkgoers who visit publicly accessible hiking trails.[3] Nor do they cover

---

[2] As for Graham, the district court focused on the rapes of RP and CN only.

[3] Graham emphasizes that "the fact that the assaults occurred in the [Smoky] Mountains—federal land—is what brings this case into federal court in the first place." (Graham Br. at 27-28.) This is certainly true. Indeed, Oliver and Graham pleaded guilty to aiding and abetting aggravated sexual assault on *federal land*. But federal land is a broad category. It includes military bases and federal prisons, for example—places where protecting vacationers isn't a concern. And so it remains the case that these Guidelines ranges do not account for the fact that Oliver and Graham raped their victims on hiking trails frequented by park-visiting families.

premeditation. Graham emphasizes that "if [his] actions were not intentional nor willful, but the result of duress or were unknowing, he would not be guilty of this crime at all." (Graham Br. at 27.) But simple intent does not capture what happened here. The duo would "ride around Knoxville, Tennessee, in their vehicle and look for homeless males who appeared to be drunk or under the influence." (R. 55, Oliver Presentence Report, PageID 1698-99; R. 40, Graham Presentence Report, PageID 178.) Not only did Oliver and Graham *know* that their victims were vulnerable, they *deliberately* and *with premeditation* hand-picked them precisely for that reason.[4] And finally, the enhancements do not account for the uniquely traumatizing way in which each rape unfolded. As the government put it, "Oliver's and Graham's *modus operandi* involved teaming up to simultaneously rape their victims orally and anally." (Appellee Br. at 16.) They "used RP's and CN's desire for human kindness as a means to inflict absolute senseless violence." (*Id.* (internal quotation omitted).) And by raping each victim "physically two times" in this way, Oliver and Graham "emotionally raped them for their entire lives." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1951.) This is not a mine-run case.

---

[4] Under U.S.S.G. § 3A1.1(b)(1), Oliver and Graham each received two-level enhancements because they knew or should have known that their victims were vulnerable. But this still doesn't fully account for the fact that Oliver and Graham premeditatively targeted the homeless. Indeed, as our caselaw reiterates, knowing that a victim is vulnerable is not the same thing as cherry-picking vulnerable victims. *See, e.g.*, *United States v. Curly*, 167 F.3d 316, 319 (6th Cir. 1999) (holding that the vulnerable victim enhancement does not require a showing of targeting); *United States v. Brawner*, 173 F.3d 966, 973 (6th Cir. 1999) (same); *United States v. Lukasik*, 250 F. App'x 135, 138 (6th Cir. 2007) ("Our court has held that the [vulnerable victim] enhancement applies if the defendant knew or should have known of the victim's vulnerability, and the government need not prove that the defendant targeted a victim *because* of her vulnerability."). It's true that Oliver's and Graham's presentence reports mention, in relation to the vulnerable victim enhancement, that "the defendant and co-defendant *targeted* [their victims]." (R. 55, Oliver Presentence Report, PageID 1700 (emphasis added); R. 40, Graham Presentence Report, PageID 179, 180 (emphasis added).) But that just shows that targeting vulnerable victims is sufficient to merit the enhancement, not that the latter fully accounts for the former.

III.

And so it is with the "greatest respect" for the district court's determinations that we assess the substantive reasonableness of Oliver and Graham's sentences. *Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough*, 552 U.S. at 109). "A claim that a sentence is substantively unreasonable is a claim that a sentence is too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). Or put another way, "[i]t's a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.* Oliver and Graham's arguments here fall into three buckets, and they are unavailing.

First, Oliver and Graham argue that the Guidelines already cover the reasons for their upward variances. But this argument fails for the simple reason that the Guidelines do not fully account for the district court's rationale, as already explained. Indeed, this is precisely why our case sits outside the heartland in the first place. We affirm if "the court also considered *a number of other factors*," and not just those covered by the Guidelines calculation, "before granting the government's motion for an upward variance." *United States v. Lanning*, 633 F.3d 469, 477 (6th Cir. 2011) (emphasis added). And in fact, "[t]his Court has consistently held that a district court neither commits procedural error, nor pronounces a substantively unreasonable sentence, simply because, in evaluating the 18 U.S.C. § 3553(a) factors, it considers, as one component of its decision to vary upward from the Guidelines, conduct that also factored into calculating the Guidelines range." *United States v. Trejo*, 729 F. App'x 396, 399 (6th Cir. 2018) (collecting cases).[5]

---

[5] Indeed, the Guidelines are only advisory—an "initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). And so district courts "must independently apply the § 3553(a) factors to each defendant to determine an appropriate sentence" rather than "lash themselves to the guidelines range." *Rayyan*, 885 F.3d at 442. That means "[a] district court *always* can impose an above-Guidelines sentence so long as it is reasonable in light of the factors set forth in 18 U.S.C.

Second, Oliver and Graham argue that the district court failed to properly account for their history and characteristics. But the record says otherwise.

Oliver claims "[t]he trial court didn't take fully into consideration the impact of childhood and adult abuse upon the defendant." (Oliver Br. at 16.) But the district court explicitly considered "physical and sexual abuse toward [Oliver] and his siblings by his father at an early age." (R. 72, Oliver Sentencing Hr'g Tr., PageID 1943.) And it noted other difficulties in his childhood, including being raised by a single mother and his struggles with bullies at school. Nor did it neglect to consider Oliver's claim that he "became involved in the offenses due to Co-defendant Graham's mental and physical influences." (*Id.* at PageID 1944-45.) And it was only after carefully considering these factors that the district court concluded they could not "excuse . . . defendant's calculated and violent behavior." (*Id.* at PageID 1948.)

As for Graham, he builds his entire argument here on a faulty premise. He claims that "[w]hen denying the request for a lesser sentence in this case, the district court noted *only* that it believed [his] personal circumstances were common when compared to other defendants." (Graham Br. at 34 (emphasis added).) But the district court did much more.

The court began by carefully reviewing each facet of Graham's history and characteristics. It explicitly considered the fact that Graham was "shunned by his biological father and his step-father, his troubled childhood, his own sexual assault and status as a victim, and his severe depressions and psychotic episodes and inability to maintain consistent employment." (R. 73, Graham Sentencing Hr'g Tr., PageID 1987.) It reviewed "the entirety of [Graham's] medical history" and reiterated his mental health challenges, limited intellectual capacity, and struggles

---

§ 3553(a)." *Herrera-Zuniga*, 571 F.3d at 589 (emphasis added). To say otherwise "would have the practical effect of making the Guidelines again mandatory, which is plainly not the law." *United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010).

with sexual identity. (*Id.* at PageID 1991.) And it considered Graham's claim that Oliver pressured him within their relationship—that "he simply went along with Oliver's plans because he did not want to make Oliver mad." (*Id.* at PageID 1988.)

The court then balanced these factors against the fact that Graham nonetheless "actively participated in the abduction and violent assaults on R.P. and C.N." in a manner that fell outside the heartland. (*Id.*) And it concluded that the protection of the public was paramount, "given the violent nature of the crimes committed, including . . . the modus operandi; the locations of the crimes; and the impacts on the victims of the sexual assaults." (*Id.* at PageID 1989.) Graham's history and characteristics, while serious, could not justify or excuse his calculated violence. (*Id.* at PageID 1991.)

We will not second-guess the district court's assessment here. Perhaps we would have balanced these factors differently had we been in the district court's shoes. Or perhaps we wouldn't have. But we cannot undertake such an analysis now. Indeed, considerations like these are "simply beyond the scope of our appellate review, which looks to whether the sentence is reasonable, as opposed to whether in the first instance we would have imposed the same sentence." *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006). And this is truer still in a non-heartland case like ours, where our deference is at its greatest.

Third and finally, Graham claims that his sentence "creates an unwarranted disparity, as the majority of people sentenced under the criminal sexual abuse guideline are sentenced within and below that guideline range." (Graham Br. at 29.) And he cites extensive data to that effect. But this argument suffers from a fatal flaw. It turns entirely on 18 U.S.C. § 3553(a)(6), which concerns itself only with "the need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of *similar* conduct." (emphasis added). In other words, the unwarranted

disparity inquiry is relevant only for mine-run cases. Graham appears to admit as much. He emphasizes that courts must look to national sentencing data when they ask "where *within the constellation of similar cases* the sentencing outcome in the present case falls." (Graham Br. at 32 (emphasis added) (quoting *United States v. Krueger*, 815 F. App'x 847, 851 (6th Cir. 2020)).)[6]

This explains why Graham cannot offer any cases from outside the heartland in advancing his argument. Each of the precedents that he marshals is a mine-run case. *See United States v. Boucher*, 937 F.3d 702, 714 (6th Cir. 2019) (an "unremarkable" "mine-run" case); *United States v. Perez-Rodriguez*, 960 F.3d 748, 757 (6th Cir. 2020) (finding that the "case falls within the mine-run of cases of illegal reentry under the Guidelines"); *Lightning*, 835 F. App'x at 42 ("[T]his case is exactly among the mine-run of felon-in-possession cases for someone with [defendant's] criminal history category."). Because our case sits beyond the heartland, this final argument falls short as well.

IV.

For these reasons, we defer to the district court and AFFIRM both sentences.

---

[6] We note for the record that *Krueger* makes no mention of national sentencing data. Indeed, we held that the sentence in that case was substantively reasonable, emphasizing that "the district court . . . weighed the factual circumstances that removed [defendant's] case from the heartland." *Krueger*, 815 F. App'x at 853.