NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0130n.06

No. 25-5315

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 12, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| Plaintiff–Appellee, | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
|  | ) |  |
| CLAIBON BURRUS, | ) |  |
| Defendant–Appellant. | ) | OPINION |

---

Before: GRIFFIN, BUSH, and NALBANDIAN, Circuit Judges.

**JOHN K. BUSH, Circuit Judge**. Claibon Burrus pleaded guilty to possession with intent to distribute, possession of a firearm in furtherance of drug trafficking, and felon in possession of a firearm. As a result, the district court sentenced him to 260 months in prison. On appeal, Burrus challenges the district court's denial of his motion to vacate and his motions to suppress. We **AFFIRM**.

**I.**

In 2020, officers began investigating the drug overdose and death of a woman, J.O. Next to her deceased body, officers found fentanyl and drug use paraphernalia. As part of the investigation, a confidential informant told investigators that J.O. frequently purchased drugs from "Yai," a Black, bald male who sold drugs and who had a phone number ending in 7846. The confidential source also told investigators that Yai lived and stored narcotics at 3038 Brookdale in Memphis, Tennessee.

In January 2021, Detective Onrico Atkins with the Memphis Police Department (MPD) applied for a search warrant for call records and GPS information associated with the phone number noted above. As part of his affidavit for the search warrant, Detective Atkins disclosed that J.O.'s boyfriend told investigators that she would frequently contact her drug dealer known as "Yay," and he provided the subject phone number. Detective Atkins also declared that officers learned that the individual using the phone had contacted other known drug dealers. During their investigation, an undercover officer called the phone number, attempting to schedule a narcotics purchase. A man answered the call, but he refused to arrange a sale because he did not recognize the undercover officer as a customer. Based on the affidavit, a magistrate judge found probable cause and issued a warrant to search the phone number records.

As the investigation into the death of J.O. continued, Sergeant Jonathan Overly with the MPD applied for a warrant to search the house located at 3038 Brookdale. As the affiant, Sergeant Overly disclosed that the confidential informant had indicated that "Yai" lived and stored narcotics at that address, and that he had seen Yai meet with individuals at various locations to sell drugs. The confidential informant also described the vehicle Yai drove, including the license plate. According to the affidavit, when Overly and Atkins surveilled the Brookdale house, they saw Burrus leave in a vehicle with the identical license plate. They also observed Burrus meet with individuals, hand over unknown objects for cash, drive slowly, and return home with the cash— all actions indicative of drug trafficking. Given this information, a magistrate judge found probable cause and issued a warrant to search the Brookdale residence.

In the house, officers found drugs, six firearms, over $11,000 in cash, and a key labeled "Move N Store."

Finally, Sergeant Timothy Bogue applied for warrants to search three storage units at a U-Store Self Storage, providing identical information for each. In the affidavits for those warrants, Bogue described the items found in the Brookdale house—including the "Move N Store" key. He also described how Burrus used family and associates to aid in his drug trafficking, and that, during jail calls, Burrus expressed concern over evidence that officers had not yet discovered. One particular associate told Burrus that the evidence was "secure" and that she "ha[d] a key." R. 41-2, Storage Unit Search Warrant, PageID 74.

The affidavits for the warrants stated that one of the storage units was secured by a "Move N Store" lock, bearing the same brand name as the key found at the house on Brookdale. What is more, U-Store employees identified Burrus as the man who paid in cash for two units. Based on this information, Overly had his K9 dog "Rocky" sniff two of the three storage units, according to the affidavit. Rocky positively alerted to the presence of drugs in both storage units (although only one of the units ended up containing drugs). Based on this information, a magistrate judge found probable cause, and he issued warrants to search all three storage units.

In one of the units, officers found cellphones, a rifle, and ammunition. In another, officers recovered various firearms, scales, and drugs. In the third storage unit, officers did not recover anything. This last storage unit, which was empty, was one of the units to which Rocky had positively alerted.

In 2021, a grand jury returned a multi-count indictment against Burrus. Burrus moved to suppress the search of his home and storage units, claiming a lack of nexus between the alleged criminal activity and the places searched. The district court denied his motion. Burrus also moved to suppress the record search of the phone number ending in 7846, and the district court denied that motion as well.

In 2024, the grand jury returned a superseding indictment. A year later, Burrus pleaded guilty to possession with intent to distribute 50 grams or more of actual methamphetamine (Count 1), possession of a firearm in furtherance of drug trafficking (Count 9), and felon in possession of a firearm (Count 10). The written plea agreement included an appeal waiver and stated that Burrus entered into the plea freely, knowingly, and voluntarily. The agreement permitted him to appeal his sentence, but only if it exceeded the maximum permitted by statute or was the result of an upward departure from the Guidelines range. The agreement also permitted Burrus to appeal the denial of his two motions to suppress. Otherwise, it noted that Burrus waived his right to appeal his conviction and sentence.

At the change-of-plea hearing, the district court questioned Burrus about the agreement to ensure he understood its terms and the rights he was forfeiting by pleading guilty. Burrus affirmed that he had entered into it of his own volition and that he understood the terms.

More than seven months later, Burrus moved to vacate his guilty plea, arguing that a strained relationship with his attorney impacted his ability to understand his plea agreement. The district court denied the motion.

At sentencing, the district court determined the Guidelines range to be 384 to 465 months. Noting that a sentence of that length would be severe, the district court departed downwards from the Guidelines and imposed a sentence of 260 months in prison. Burrus timely appealed.

**II.**

Burrus first challenges the district court's denial of his motion to vacate his guilty plea. However, for us to reach the merits of Burrus's argument, he must demonstrate that he has preserved his right to appeal. *See United States v. Mendez-Santana*, 645 F.3d 822, 828 (6th Cir. 2011). He has not done so.

4

Whether a defendant has waived certain appellate rights in a valid plea agreement is a question we review de novo. *United States v. Detloff*, 794 F.3d 588, 592 (6th Cir. 2015). When a defendant knowingly and voluntarily enters into a plea agreement, he "routinely" waives certain rights through an appeal waiver. *United States v. Ellis*, 115 F.4th 497, 500 (6th Cir. 2024); *see also Garza v. Idaho*, 586 U.S. 232, 238–39 (2019). An appeal waiver precludes appellate review if "(1) the defendant's claim falls within the scope of the appeal waiver provision; and (2) the defendant 'knowingly and voluntarily' agreed to the plea agreement and waiver." *United States v. Milliron*, 984 F.3d 1188, 1193 (6th Cir. 2021).

Burrus's claim falls within the scope of the waiver provision, and he also knowingly and voluntarily agreed to the plea agreement and waiver. Thus, his challenge to the district court's denial of his motion to vacate is necessarily waived.

Consider first the scope of the waiver provision in Burrus's plea agreement. Per its terms, Burrus "waives all rights . . . to appeal any sentence imposed or to appeal the manner in which the sentence was imposed." R. 93, Plea Agreement, PageID 267. Burrus also "agrees to waive his right to challenge his conviction and sentence." *Id.* The agreement explicitly permits Burrus to appeal just two issues: his sentence (but only if it exceeds the maximum permitted by statute or is the result of an upward departure from the Guidelines range) and the district court's denial of his motions to suppress. Nothing more. Indeed, the appellate waiver in the agreement makes clear that Burrus waived all other rights on appeal.

We are bound by the terms of the appeal waiver. *See Ellis*, 115 F.4th at 500 ("[We] enforce an appeal waiver according to its terms to 'give effect to the intent of the parties as expressed by the plain language in the plea agreement.'" (quoting *United States v. Beals*, 698 F.3d 248, 256 (6th

5

Cir. 2012))). Recognizing this and that Burrus's challenge does not fit within one of the preserved exceptions, we conclude that the scope of the waiver subsumes Burrus's claim.

Next we address whether Burrus knowingly and voluntarily agreed to the appeal waiver, which we answer in the affirmative. Burrus signed the written plea agreement, representing that he "freely, knowingly, and voluntarily" entered into the agreement. R. 93, Plea Agreement, PageID 265. The change-of-plea hearing transcript reflects the same. At the hearing, the district court questioned Burrus at length about the plea agreement and the indictment, including the appellate rights he was forfeiting by pleading guilty. Burrus stated that he understood the terms in the plea agreement and he entered into it freely, knowingly, and voluntarily. Simply put, the record shows that the district court conducted a thorough plea colloquy and Burrus understood the rights he waived by pleading guilty. *See Ellis*, 115 F.4th at 501 (noting that once a district court ensures a defendant understands the rights he is waiving by pleading guilty, the defendant's "admissions at the plea hearing serve as a 'formidable barrier' to later claims that the defendant misunderstood something about the plea").

For these reasons, we decline to consider the merits of Burrus's motion to vacate.

### III.

Burrus next argues that the district court erred when it denied his motions to suppress the search of his cellphone records, residence, and storage units. We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. McPhearson*, 469 F.3d 518, 523 (6th Cir. 2006). In so doing, we view the evidence in the "light most likely to support the district court's decision." *Id.* (quoting *United States v. Williams*, 962 F.3d 1218, 1221 (6th Cir. 1992)).

**A.**

Burrus contends that the district court erroneously denied his motion to suppress the search of his cellphone records because the search warrant affidavit failed to establish probable cause. Specifically, he alleges that the confidential informant was unreliable, the information was stale, and the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984), does not apply because the affidavit is "bare bones." Given that the *Leon* good faith exception applies regardless of the probable cause determination, we find his argument unavailing.

Under *Leon* and its progeny, evidence is admissible despite any defects in the magistrate judge's probable cause analysis if the officers relied in good faith on a facially valid warrant to conduct the search. *See Leon*, 468 U.S. at 905; *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc). In this inquiry, we ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 905 n.23. "Only when the answer is 'yes' is suppression appropriate." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017).

The *Leon* good faith-exception does not apply if the affidavit to support the search warrant is so lacking in indicia of probable cause that it is a "bare bones" affidavit—that is, if it only "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Christian*, 925 F.3d at 312 (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004)). This is a high burden to satisfy; an affidavit must be "woefully deficient" to meet this standard. *Id.* For example, an affidavit is bare bones if it solely declares the affiant's belief that probable cause has been shown, demonstrates mere guesswork, or is totally devoid of facts to support probable cause or is so vague as to render it conclusory. *White*, 874 F.3d at 496.

By contrast, if we can identify even "a minimally sufficient nexus between the illegal activity and the place to be searched," then the affidavit is *not* bare bones and reliance upon it is reasonable. *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004). Indeed, all that is required for the good faith exception to apply is "some modicum of evidence, however slight" between the alleged illegal activity and the place to be searched. *White*, 874 F.3d at 497 (quoting *United States v. Laughton*, 409 F.3d 744, 749 (6th Cir. 2005)).

Here, the affidavit in support of the search warrant for Burrus's phone records is a far cry from a bare bones affidavit. The affidavit reveals that the affiant is an experienced officer with specialized training in drug investigations. It also declares that J.O.'s mother and boyfriend told officers that J.O. was a recovering drug addict, and that she would contact her drug dealer named "Yay" at the phone number ending in 7846 to purchase drugs in public areas. The affidavit also declares that officers discovered the subject phone number to have been used to contact other known drug dealers. And during this investigation, an undercover officer called the phone number, attempting to purchase drugs. Although the man answering the phone call said he would not sell to the undercover officer, the reason he gave for refusing the sale—he did not recognize the officer "as a usual customer"—confirmed that the phone number was used for drug sales. R. 68-1, Affidavit for Cellphone Records, PageID 157. In sum, the affidavit contained information about the extensive experience of the affiant, the relation between J.O.'s drug habits and the subject phone number, the phone's contact with other known drug dealers, and the undercover officer's experience calling the phone number in an attempt to plan a controlled buy. Based on this information, the affidavit is not so lacking in probable cause so as to render the officers' reliance on it unreasonable. *See White*, 874 F.3d at 497.

**B.**

Finally, Burrus alleges that the affidavits for the search of his residence and storage units did not show a nexus between the items to be seized and any criminal behavior. He also argues that the K9 was unreliable because it made a false alert on one of the three storage units searched. Here again, the *Leon* good-faith exception defeats Burrus's challenge to the exclusionary rule. Regardless of the probable cause determination, *Leon* precludes suppression.

The affidavit for the search of Burrus's residence presents at least a modicum of evidence that Burrus engaged in drug trafficking activities and that he stored drugs there. *See White*, 874 F.3d at 497. It demonstrates that during officers' investigation, an informant stated that "Yai," a drug dealer, lived and stored narcotics at the address. Officers surveilled the house and those who frequented it and observed behavior indicative of drug activity. That information, along with their training and experience in drug trafficking, led investigators to believe that evidence of drug trafficking would be found at Burrus's home. Based on the affidavit, we cannot say that a reasonably well-trained officer would have reason to know that the search of the residence was, as Burrus argues, illegal.

So too for the search of the storage units. The affidavits in support of the search warrants reflect that officers searched Burrus's residence and found drugs, cash, and cellphones containing text messages about drug transactions. Officers also recovered a key labeled "Move N Store" and believed it to belonged to a storage unit. U-store employees later identified Burrus as having paid the monthly rental fee for the storage units, and officers noticed that one of the units had a lock brand identical to the key found at Burrus's home. Investigators then had a K9 dog named "Rocky" sniff two of the units, and he alerted to both. The affiant also declared that, based on his training and experience, drug traffickers often use storage units to hide evidence of trafficking.

We conclude that affidavits supporting the search of Burrus's residence and storage units support an objectively reasonable, good-faith belief that the probable cause determination was lawful.  Thus, regardless of whether probable cause in fact existed, the *Leon* good-faith exception would apply, and suppression of the seized evidence is inappropriate.

**IV.**

For these reasons, we **AFFIRM** the district court's judgment.